### CLAY SEWER PIPE ASS'N, Inc., v. COMMISSIONER OF INTERNAL REVENUE.

#### No. 8399.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 5, 1943.

Decided Dec. 6, 1943.

Robert Guinther, of Akron, Ohio (Slabaugh, Seiberling, Guinther & Pflueger, of Akron, on the brief), for petitioner.

Muriel S. Paul, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, A. F. Prescott, and Louise Foster, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before BIGGS, GOODRICH, and McLAUGHLIN, Circuit Judges.

GOODRICH, Circuit Judge.

The taxpayer, Clay Sewer Pipe Association, Inc., came into being at the behest of several manufacturers in the clay sewer pipe industry in order to promote the sales of vitrified clay sewer pipe over sewer pipes made of other materials. Its formation was suggested to the industry by H. C. Maurer in 1938. Mr. Maurer had had considerable experience as sales manager of a clay sewer pipe company. The plan was to have the industry hire a chief engineer and subordinate who would go out into the various states and by personal contact attempt to expand the use of clay sewer pipe and to prepare and distribute technical literature about clay pipe. It was indicated by Maurer that to develop such a program would probably take at least two or three years. The program was to be paid for by having each member pay .4 of 1 percent on the tonnage it sold, or $.24 per ton. Maurer explained that during the first year the receipts would exceed the expenditures and he told one of the manufacturers that the excess money could be put in a special fund and held until they could "judicially expend" it. Maurer signed pre-incorporation contracts with 19 manufacturers which provided for the formation of a corporation, its purposes[1] as planned, mutual inspection of books and for continuation of the contract for yearly periods unless fifteen days notice of discontinuance were given by any manufacturer. Clay Sewer Pipe Associa-

---

[1] The agreement provided that the Association was to provide services to its members which "shall include diligent efforts to advance Public Knowledge of the advantages of Vitrified Clay Sewer Pipe over pipe made of other materials; to collect and distribute information concerning prospective uses of sewer pipe generally; to collect and distribute information concerning the quantities of Vitrified and other Sewer Pipe used, from time to time, in construction work; to perform laboratory and research work for the purpose of demonstrating the usability and advantages of Vitrified Sewer Pipe in differing soils and locations; to prepare and publish advertising material dealing with the merits of Vitrified Sewer Pipe; and, generally, to promote the use of Vitrified Clay Sewer Pipe and Products in Public Works constructed by Cities, Counties, Villages and the like, and by all other users of Sewer Pipe." A similar statement of purpose is found in the articles of incorporation subsequently drawn up.

tion, Inc. was then incorporated under the laws of Ohio as a "corporation for profit". The articles provided that shares of stock were to be issued only to those who subscribed for and agreed to pay for the services to be performed by the corporation and limited each subscriber to one share. If a shareholder ceased to be a subscriber for the services his share certificate was to be cancelled. Upon liquidation or dissolution, or at the time of any other distribution of surplus of assets, each shareholder was to be entitled to participate in the distribution in proportion to the amount previously paid by him to the corporation for its services. The "Code of Regulations" of the Association provided for "dividends or distributions" on this basis. No money was paid for the capital stock of the Association which was carried on the books at the declared nominal value of $1.00.

The Association established an office in Pittsburgh and proceeded to carry out the original plan. During 1939, as originally predicted, the Association did not do much and had comparatively small expenses. Payments were made by the Association members during that year according to plan. At the end of the year such payments exceeded the expenses.[2] In its income tax return for 1939, on an accrual basis, the taxpayer reported income of $107,648.18, but reported no tax due on account of deductions it had taken. One of the deductions taken was a "Reserve for future expenses" totalling $32,347.23 with a notation "Income deferred for expenditures for performance of contract services. * * * This amount represents the excess of income received and accrued from expenses paid and incurred representing prepayments and advance billings for services to be performed." The Commissioner disallowed this deduction, and his position was sus-

tained by the Tax Court. This appeal followed.

The taxpayer seeks to sustain its deduction on the broad theory that an excess of receipts over expenditures does not constitute income where the excess must be subsequently expended. Here, it says, it received the money from its members as a prepayment for services and was under an obligation to use the money only in the manner provided in the contract made with its subscribers. This premise, as applied to the facts of the case, does not, however, support the legal conclusion urged.

■ The test determining the taxability of the payments is whether they were received under a claim of right and without restriction as to their disposition. North American Oil Consolidated v. Burnet, 1932, 286 U.S. 417, 424, 52 S.Ct. 613, 76 L.Ed. 1197. The taxpayer does not contend, and with apparent good reason,[3] that mere receipt by a taxpayer on an accrual basis, of money as a prepayment for services to be rendered in future years prevents taxation, as income in the year received. Nor does it deny that the money involved here was received under a claim of right, that is, its contracts with its shareholders. But it does urge that restrictions as to the use and disposition of the income takes it outside the rule of the North American Oil case and the comparable decision in Brown v. Helvering, 1934, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725.

■ What are the claimed restrictions? (1) It is pointed out that the original contemplation of the parties was that the excess of the receipts over expenditures in the initial years of the Association was to be judiciously expended and put in a special fund.[4] Yet neither of these points

---

[2] In 1940 and 1941 the amounts paid out for performing the services were larger than the amounts paid in by the subscribers during those years.

[3] Earnings consisting of prepayments made without restrictions have been treated generally as income for year received even though taxpayer may have been on an accrual basis. See 2 Mertens, Law of Federal Income Taxation (1942) §§ 12.24; 12.-27 (subscriptions received by publishing company, but note subsequent caveat); 12.30 (rent, bonus, or royalty); Creasey Corporation v. Helburn, D.C.W.D.Ky. 1932, 57 F.2d 204 (wholesale purchasing service); Automobile Underwriters, Inc., v. Commissioner of Internal Revenue,

1930, 19 B.T.A. 1160 (membership fees for services of reciprocal insurance association). This mode of treatment has been criticized, as to taxpayers on the accrual method, as a "gross and, * * * quite unnecessary distortion of income." Magill, Taxable Income (1936) pp. 174, 175.

[4] The Tax Court found that the taxpayer maintained two accounts, one of which it denominated its active account and a second one to which it transferred $5,000, in April, 1939, which was in excess of the money the taxpayer needed in the actual conduct of its business but which had been collected from the manufacturers. This amount was subsequently increased to $20,-000.

were incorporated into the formal agreement or elsewhere. The Association was not bound to set up a special fund of such excess. And, certainly the condition of judicious expenditure is common to corporate funds generally. (2) The nature of the interest of the shareholders in the corporate funds is emphasized, that distributions, if any, were to be made in proportion to contributions. But the Supreme Court in the North American Oil case clearly stated, earnings which otherwise meet the test as taxable, remain taxable although the recipient claims he is not entitled to retain them and may be adjudged liable to return their equivalent. See also Brown v. Helvering, supra; Commissioner of Internal Revenue v. Alamitos Land Co., 9 Cir., 1940, 112 F.2d 648, certiorari denied 1940, 311 U.S. 679, 61 S.Ct. 46, 85 L.Ed. 437; Commissioner of Internal Revenue v. Brooklyn Union Gas Co., 2 Cir., 1933, 62 F. 2d 505. This result has obtained even where the taxpayer was required to set up a fund to repay the money at a future date. Cleveland R. Co. v. Commissioner of Internal Revenue, 6 Cir., 1929, 36 F.2d 347 certiorari denied 1930, 281 U.S. 743, 50 S. Ct. 348, 74 L.Ed. 1156. Furthermore, the provisions for distributions by way of dividends or upon dissolution to shareholders did not in any way restrict the use of the money for corporate purposes. Neither the equation for distribution nor the provision that shareholders who withdrew from the Association would receive nothing imposed a limitation on corporate use. In fact, under the latter provisions it was possible that shareholders could receive a distribution which would be proportionately larger or smaller than their proportionate contributions since original shareholders could withdraw or new ones enter the Association.

(3) The taxpayer urges its obligation to perform services as a restriction on the use of the money it received. The answers to this contention are several. No provision in the contract made with the shareholders or in the articles of the Association has been shown which defines when, where, or how the money paid in was to be used. The money could be allocated as the directors saw fit. It is true that the money was in payment for services to be rendered by the Association and would be expected to be used for that purpose, although it is significant that the Association did not have to expend all of its receipts in rendering services but could distribute them to its shareholders as dividends. Any corporation is of course normally regarded as restricted to the powers contained in its charter in the use of its funds and in the obligations it may undertake. And, these are the very restrictions the taxpayer points to here. It was organized and empowered to promote the use of vitrified clay sewer pipe; it entered into contracts to render such services and the money it received could be used in its general business to enable it to fulfill its corporate purposes. We think it is apparent that the ordinary restrictions upon corporate activity due to the charter powers of the corporation, such as those relied upon by the taxpayer, are not tantamount to restrictions which will render monies received non-taxable for income tax purposes.[5]

▆ (4) Nor, for the reasons just stated, can the taxpayer's contention that the 1939 excess constituted a trust fund, and thus escaped taxation, fare any better. There was no obligation to segregate that fund or its equivalent and the fund could be used for the general corporate business. The cemetery cases relied on by the taxpayer, where monies received for the maintenance and upkeep of mausoleum crypts or cemetery plots have been held to constitute trust funds, differ in that fact. See 2 Mertens, Law of Federal Income Taxation (1942) § 12.71. The designation by the taxpayer of the 1939 excess as "Reserve for future expenses" is of no significance for tax purposes. It was really not a reserve at all in the sense of a fund set up to meet specified obligations incurred during

[5] Air-way Electric Appliance Corporation v. Guitteau, 6 Cir., 1941, 123 F.2d 20, is relied on by taxpayer. In that case there was a fixed obligation to return a fixed sum to the company's distributors.

[6] 26 U.S.C.A. Int.Rev.Acts, page 1037: "Sec. 101. Exemptions from tax on corporations.

"The following organizations shall be exempt from taxation under this title—
* * *
"(7) Business leagues, chambers of commerce, real-estate boards, or boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual;"

the year, but was admittedly the difference between receipts and expenditures for the year, which could be used for the business generally.

The taxpayer also raises the point that it is entitled to exemption under § 101 (7) of the Revenue Act of 1938[6] as an exempted corporation. The opinion of the Tax Court states that "from the record it appears clearly that petitioner admits that it was not so exempt." The taxpayer disputes the fact of this admission and presses a motion for further hearing and reconsideration made following the decision of its case in the Tax Court. To this the counsel for the Commissioner answers that the motion was not made within the time allotted by the rules of the Tax Court and argues that the Tax Court was correct in peremptorily overruling the taxpayer's motion.

Without considering the question of whether the taxpayer was entitled, as of right, to have its contention considered, we are clearly of the opinion that it has not shown itself entitled to be placed in the exempt class. The statute requires that the organization be one "not organized for profit." The taxpayer was organized as a corporation for profit under the Ohio law as has been stated. Among its stated corporate purposes were to collect and distribute information concerning sewer pipe, to perform laboratory and research work; to prepare and publish advertising material. While only those who subscribed to its services were to be its shareholders we see nothing which prevented it from selling services, information, expert advice, or perhaps, even sewer pipe to anyone else it could find as a customer. Furthermore, under the provisions for dividends and other distributions it was possible that part of the net earnings of the Association could inure to the benefit of its shareholders, also contrary to the requirement of the statute.

The facts show that the taxpayer in 1943 changed its form of organization to make itself a corporation not for profit under the Ohio law. That fact, of course, cannot affect its status for 1939, the tax year in question.

The decision of the Tax Court is affirmed.