## SCHLUDE ET UX. *v.* COMMISSIONER
## OF INTERNAL REVENUE.

No. 80.  Argued December 10, 1962.—Decided February 18, 1963.

*Carl F. Bauersfeld* argued the cause for petitioners. With him on the briefs was *Robert Ash.*

*Assistant Attorney General Oberdorfer* argued the cause for respondent.  With him on the brief were *Solicitor General Cox* and *Harry Baum.*

*Dean Acheson, Fontaine C. Bradley, John T. Sapienza, Robert L. Randall* and *Alvin Friedman* filed briefs for the American Institute of Certified Public Accountants, as *amicus curiae,* urging reversal.

Mr. Justice White delivered the opinion of the Court.

This is still another chapter in the protracted problem of the time certain items are to be recognized as income for the purposes of the federal income tax. The Commissioner of Internal Revenue increased the 1952, 1953 and 1954 ordinary income of the taxpayers [1] by including in gross income for those years amounts received or receivable under contracts executed during those years despite the fact that the contracts obligated taxpayers to render performance in subsequent periods. These increases produced tax deficiencies which the taxpayers unsuccessfully challenged in the Tax Court on the ground that the amounts could be deferred under their accounting method. On appeal, the Court of Appeals for the Eighth Circuit agreed with the taxpayers and reversed the Tax Court, 283 F. 2d 234, the decision having been rendered prior to ours in *American Automobile Assn.* v. *United States,* 367 U. S. 687. Following the *American Automobile Association* case, certiorari in this case was granted, the judgment of the lower court vacated, 367 U. S. 911, and the cause remanded for further consideration in light of *American Automobile Association.* 368 U. S. 873. In a *per curiam* opinion, the Court of Appeals held that in view of *American Automobile Association,* the taxpayers' accounting method "does not, for income tax purposes, clearly reflect income" and affirmed the judgment for the

---

[1] The controversy turns upon the accounting method employed by a partnership in which the taxpayers were equal partners. Since a partnership is not a taxable entity, the partners being liable in their individual capacities for their distributive share of partnership income, § 181, Int. Rev. Code of 1939; § 701, Int. Rev. Code of 1954, the proper statement of the partnership's income affects only the tax liabilities of the partners individually. However, as there is no other dispute in the case, for convenience the discussion will center upon the partnership's accounting method without further mention of its effect upon the respective tax liabilities of the partners.

Commissioner, 296 F. 2d 721.   We brought the case back once again to consider whether the lower court misapprehended the scope of *American Automobile Association*. 370 U. S. 902.

Taxpayers, husband and wife, formed a partnership to operate ballroom dancing studios (collectively referred to as "studio") pursuant to Arthur Murray, Inc., franchise agreements.   Dancing lessons were offered under either of two basic contracts.   The cash plan contract required the student to pay the entire down payment in cash at the time the contract was executed with the balance due in installments thereafter.   The deferred payment contract required only a portion of the down payment to be paid in cash.   The remainder of the down payment was due in stated installments and the balance of the contract price was to be paid as designated in a negotiable note signed at the time the contract was executed.

Both types of contracts provided that (1) the student should pay tuition for lessons in a certain amount, (2) the student should not be relieved of his obligation to pay the tuition, (3) no refunds would be made, and (4) the contract was noncancelable.[2]   The contracts prescribed a specific number of lesson hours ranging from five to 1,200 hours and some contracts provided lifetime courses entitling the student additionally to two hours of lessons per month plus two parties a year for life.   Although the contracts designated the period during which the lessons had to be taken, there was no schedule of specific dates, which were arranged from time to time as lessons were given.

---

[2] Although the contracts stated they were noncancelable, the studio frequently rewrote contracts reducing the number of lessons for a smaller sum of money.   Also, despite the fact that the contracts provided that no refunds would be made, and despite the fact that the studio discouraged refunds, occasionally a refund would be made on a canceled contract.

Cash payments received directly from students and amounts received when the negotiable notes were discounted at the bank or fully paid [3] were deposited in the studio's general bank account without segregation from its other funds. The franchise agreements required the studio to pay to Arthur Murray, Inc., on a weekly basis, 10% of these cash receipts as royalty and 5% of the receipts in escrow, the latter to continue until a $20,000 indemnity fund was accumulated. Similarly, sales commissions for lessons sold were paid at the time the sales receipts were deposited in the studio's general bank account.

The studio, since its inception in 1946, has kept its books and reported income for tax purposes [4] on an accrual system of accounting. In addition to the books, individual student record cards were maintained showing the number of hours taught and the number still remaining under the contract. The system, in substance, operated as follows. When a contract was entered into, a "deferred income" account was credited for the total contract price. At the close of each fiscal period, the student record cards were analyzed and the total number of taught hours was multiplied by the designated rate per hour of each contract. The resulting sum was deducted from the deferred income account and reported as earned income

---

[3] Notes taken from the students were ordinarily transferred, with full recourse, to a local bank which would deduct the interest charges and credit the studio with approximately 50% of the face amount. The remaining 50% was held in a reserve account, unavailable to the studio, until the note was fully paid, at which time the reserved amount was transferred to the studio's general bank account.

[4] Though the studio is not a taxable entity, it is still required to prepare and file an information return showing, inter alia, items of gross income and allowable deductions. § 187, 1939 Code; § 6031, 1954 Code.

on the financial statements and the income tax return. In addition, if there had been no activity in a contract for over a year, or if a course were reduced in amount, an entry would be made canceling the untaught portion of the contract, removing that amount from the deferred income account, and recognizing gain to the extent that the deferred income exceeded the balance due on the contract, i. e., the amounts received in advance. The amounts representing lessons taught and the gains from cancellations constituted the chief sources of the partnership's gross income.[5] The balance of the deferred income account would be carried forward into the next fiscal year to be increased or decreased in accordance with the number of new contracts, lessons taught and cancellations recognized.

Deductions were also reported on the accrual basis except that the royalty payments and the sales commissions were deducted when paid irrespective of the period in which the related receipts were taken into income. Three certified public accountants testified that in their opinion the accounting system employed truly reflected net income in accordance with commercial accrual accounting standards.

The Commissioner included in gross income for the years in question not only advance payments received in

---

[5] The following schedule reflects ordinary net income on the studio's books and returns:

Gross income:

| | 1952 | 1953 | 1954 |
|---|---|---|---|
| Contract amounts transferred to earned income.. | $143,949.63 | $243,277.46 | $325,266.97 |
| Gains from cancellation... | 26,861.40 | 19,483.36 | 28,448.61 |
| Other income............ | 4,041.21 | 11,426.23 | 16,987.31 |
| Total.................. | 174,852.24 | 274,187.05 | 370,702.89 |
| Deductions................,..... | 137,267.91 | 223,390.69 | 301,609.76 |
| Ordinary net income.......... | 37,584.33 | 50,796.36 | 69,093.13 |

cash but the full face amounts of notes and contracts executed during the respective years. The Tax Court and the Court of Appeals upheld the Commissioner, but the United States in this Court has retreated somewhat and does not now claim the includibility in gross income of future payments which were not evidenced by a note and which were neither due by the terms of the contract nor matured by performance of the related services.[6] The question remaining for decision, then, is this: Was it proper for the Commissioner, exercising his discretion under § 41,[7] 1939 Code, and § 446 (b),[8] 1954 Code,

---

[6] "Upon reconsideration, however, we concede the error of accruing future payments which are neither due as a matter of contract, nor matured by performance of the related services. Indeed, the Studio's right to collect the installment on its due date depends on its continuing ability and willingness to perform. Until that time, its right to receive payment has not fully ripened." Brief for the United States, p. 67.

[7] "SEC. 41. GENERAL RULE.

"The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year."

[8] "SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

"(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

"(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such

to reject the studio's accounting system as not clearly reflecting income and to include as income in a particular year advance payments by way of cash, negotiable notes and contract installments falling due but remaining unpaid during that year? We hold that it was since we believe the problem is squarely controlled by *American Automobile Association,* 367 U. S. 687.

The Court there had occasion to consider the entire legislative background of the treatment of prepaid income. The retroactive repeal of § 452 of the 1954 Code, "the only law incontestably permitting the practice upon which [the taxpayer] depends," was regarded as reinstating long-standing administrative and lower court rulings that accounting systems deferring prepaid income could be rejected by the Commissioner.

> "[T]he fact is that § 452 for the first time specifically declared petitioner's system of accounting to be acceptable for income tax purposes, and overruled the long-standing position of the Commissioner and courts to the contrary. And the repeal of the section the following year, upon insistence by the Treasury that the proposed endorsement of such tax accounting would have a disastrous impact on the Government's revenue, was just as clearly a mandate from the Congress that petitioner's system was not acceptable for tax purposes." 367 U. S., at 695.

---

method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

"(c) PERMISSIBLE METHODS.—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—

"(1) the cash receipts and disbursements method;

"(2) an accrual method;

"(3) any other method permitted by this chapter; or

"(4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary or his delegate."

Confirming that view was the step-by-step approach of Congress in granting the deferral privilege to only limited groups of taxpayers while exploring more deeply the ramifications of the entire problem.

Plainly, the considerations expressed in *American Automobile Association* are apposite here. We need only add here that since the *American Automobile Association* decision, a specific provision extending the deferral practice to certain membership corporations was enacted, § 456, 1954 Code, added by § 1, Act of July 26, 1961, 75 Stat. 222, continuing, at least so far, the congressional policy of treating this problem by precise provisions of narrow applicability. Consequently, as in the *American Automobile Association* case, we invoke the "long-established policy of the Court in deferring, where possible, to congressional procedures in the tax field," and, as in that case, we cannot say that the Commissioner's rejection of the studio's deferral system was unsound.

The *American Automobile Association* case rested upon an additional ground which is also controlling here. Relying upon *Automobile Club of Michigan* v. *Commissioner*, 353 U. S. 180, the Court rejected the taxpayer's system as artificial since the advance payments related to services which were to be performed only upon customers' demands without relation to fixed dates in the future. The system employed here suffers from that very same vice, for the studio sought to defer its cash receipts on the basis of contracts which did not provide for lessons on fixed dates after the taxable year, but left such dates to be arranged from time to time by the instructor and his student. Under the contracts, the student could arrange for some or all of the additional lessons or could simply allow their rights under the contracts to lapse. But even though the student did not demand the remaining lessons, the contracts permitted the studio to insist upon payment in accordance with the obligations undertaken and to retain

whatever prepayments were made without restriction as to use and without obligation of refund. At the end of each period, while the number of lessons taught had been meticulously reflected, the studio was uncertain whether none, some or all of the remaining lessons would be rendered. Clearly, services were rendered solely on demand in the fashion of the *American Automobile Association* and *Automobile Club of Michigan* cases.[9]

Moreover, percentage royalties and sales commissions for lessons sold, which were paid as cash was received from students or from its note transactions with the bank, were deducted in the year paid even though the related items of income had been deferred, at least in part, to later periods. In view of all these circumstances, we hold the studio's accrual system vulnerable under § 41 and § 446 (b) with respect to its deferral of prepaid income. Consequently, the Commissioner was fully justified in including payments in cash or by negotiable note[10] in gross income for the year in which such payments were received. If these payments are includible in the year of receipt because their allocation to a later year does not clearly reflect income, the contract installments are likewise includible in gross income, as the United States now

---

[9] The treatment of "gains from cancellations" underlines this aspect of the case. These gains, representing amounts paid or promised in advance of lessons given, were recognized in those periods in which the taxpayers arbitrarily decided the contracts were to be deemed canceled. The studio made no attempt to report estimated cancellations in the year of receipt, choosing instead to defer these gains to periods bearing no economic relationship to the income recognized. Cf. *Continental Tie & Lumber Co.* v. *United States,* 286 U. S. 290.

[10] Negotiable notes are regarded as the equivalent of cash receipts, to the extent of their fair market value, for the purposes of recognition of income. § 39.22 (a)–4, Treas. Reg. 118, 1939 Code; § 1.61–2 (d) (4), Treas. Reg., 1954 Code; Mertens, Federal Income Taxation (1961), § 11.07. See *Pinellas Ice Co.* v. *Commissioner,* 287 U. S. 462.

claims, in the year they become due and payable. For an accrual basis taxpayer "it is the *right* to receive and not the actual receipt that determines the inclusion of the amount in gross income," *Spring City Co.* v. *Commissioner,* 292 U. S. 182, 184; *Commissioner* v. *Hansen,* 360 U. S. 446, and here the right to receive these installments had become fixed at least at the time they were due and payable.

We affirm the Court of Appeals insofar as that court held includible the amounts representing cash receipts, notes received and contract installments due and payable. Because of the Commissioner's concession, we reverse that part of the judgment which included amounts for which services had not yet been performed and which were not due and payable during the respective periods and we remand the case with directions to return the case to the Tax Court for a redetermination of the proper income tax deficiencies now due in light of this opinion.

*It is so ordered.*

MR. JUSTICE STEWART, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE HARLAN, and MR. JUSTICE GOLDBERG join, dissenting.

As the Court notes, this case is but the most recent episode in a protracted dispute concerning the proper income tax treatment of amounts received as advances for services to be performed in a subsequent year by a taxpayer who is on an accrual rather than a cash basis. The Government has consistently argued that such amounts are taxable in the year of receipt, relying upon two alternative arguments: It has claimed that deferral of such payments would violate the "annual accounting" principle which requires that income not be postponed from one year to the next to reflect the long-term economic result of a transaction. Alternatively, the Government

has argued that advance payments must be reported as income in the year of receipt under the "claim-of-right doctrine," which requires otherwise reportable income, held under a claim of right without restriction as to use, to be reported when received despite the fact that the taxpayer's claim to the funds may be disputed.[1]

As I have elsewhere pointed out, neither of these doctrines has any relevance to the question whether any reportable income at all has been derived when payments are received in advance of performance by an accrual-basis taxpayer.[2] The most elementary principles of accrual accounting require that advances be considered reportable income only in the year they are earned by the taxpayer's rendition of the services for which the payments were made. The Government's theories would

---

[1] The Commissioner has sometimes been successful in urging the "claim-of-right doctrine" as a bar to the deferral of advances by accrual-basis taxpayers. See, e. g., Andrews v. Commissioner, 23 T. C. 1026, 1032–1033; South Dade Farms v. Commissioner, 138 F. 2d 818 (C. A. 5th Cir.); Clay Sewer Pipe Assn. v. Commissioner, 139 F. 2d 130 (C. A. 3d Cir.); Automobile Club of Michigan v. Commissioner, 230 F. 2d 585, 591 (C. A. 6th Cir.), aff'd on other grounds, 353 U. S. 180.

In more recent cases, on the other hand, the Courts of Appeals have held the claim-of-right doctrine irrelevant to this problem. Bressner Radio, Inc., v. Commissioner, 267 F. 2d 520, 524, 525–528 (C. A. 2d Cir.); Schuessler v. Commissioner, 230 F. 2d 722, 725 (C. A. 5th Cir.); Beacon Publishing Co. v. Commissioner, 218 F. 2d 697, 699–701 (C. A. 10th Cir.).

In the present case the Commissioner urged that the "claim-of-right doctrine" was applicable even to advance fees which were due under the contract but not yet paid, a position from which he receded only when the case reached this Court. The Tax Court, at least in one case, has accepted the argument. Your Health Club, Inc., v. Commissioner, 4 T. C. 385.

[2] See American Automobile Assn. v. United States, 367 U. S. 687, at 699–702 (dissenting opinion).

force upon an accrual-basis taxpayer a cash basis for advance payments in disregard of the federal statute which explicitly authorizes income tax returns to be based upon sound accrual accounting methods.[3]

Apparently the Court agrees that neither the annual accounting requirement nor the claim-of-right doctrine has any relevance or applicability to the question involved in this case. For the Court does not base its decision on either theory, but rather, as in two previous cases,[4] upon the ground that the system of accrual accounting used by these particular taxpayers does not "clearly reflect income" in accord with the statutory command.[5] This result is said to be compelled both by a consideration of legislative history and by an analysis of the particular accounting system which these taxpayers employed.

For the reasons I have elsewhere stated at some length,[6] to rely on the repeal of §§ 452 and 462 as indicating con-

---

[3] "SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

"(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which' the taxpayer regularly computes his income in keeping his books.

"(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

"(c) PERMISSIBLE METHODS.—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—

"(2) an accrual method; . . . ."

[4] Automobile Club of Michigan v. Commissioner, 353 U. S. 180, and American Automobile Assn. v. United States, 367 U. S. 687.

[5] See note 3, supra. See also § 41, 1939 Code.

[6] See American Automobile Assn. v. United States, 367 U. S., at 703–711 (dissenting opinion).

gressional disapproval of accrual accounting principles is conspicuously to disregard clear evidence of legislative intent. The Secretary of the Treasury, who proposed the repeal of these sections, made explicitly clear that no inference of disapproval of accrual accounting principles was to be drawn from the repeal of the sections.[7]  So did the Senate Report.[8]  The repeal of these sections was occasioned solely by the fear of temporary revenue losses which would result from the taking of "double deductions" during the year of transition by taxpayers who had not previously maintained their books on an accrual basis.[9]

The Court's decision can be justified, then, only upon the basis that the system of accrual accounting used by the taxpayers in this case did not "clearly reflect income" in accordance with the command of § 41.  In the *Automobile Club of Michigan* case [10] the taxpayer allocated yearly dues ratably over 12 months, so that only a portion of the dues received during any fiscal year was reported as income for that year.  In the absence of any proof that services demanded by the Automobile Club members were distributed in the same proportion over the year, the Court held that the system used by the taxpayer did not clearly reflect income.  In the *American Automobile Association* case [11] the taxpayer offered statistical proof to show that its proration of dues reasonably matched the proportion of its yearly costs incurred each month in rendering services attributable to those dues.  The Court discounted the validity of this statistical evidence because

---

[7] H. R. Rep. No. 293, 84th Cong., 1st Sess. 5.

[8] S. Rep. No. 372, 84th Cong., 1st Sess. 5–6.  See also H. R. Rep. No. 293, 84th Cong., 1st Sess. 4–5.

[9] Since the taxpayers in the present case have consistently maintained their books on an accrual basis, they could not have taken advantage of a "double deduction" even under the repealed sections.

[10] 353 U. S. 180.

[11] 367 U. S. 687.

the amount and timing of the services demanded were wholly within the control of the individual members of the Association, and the Court thought that the Association could not, therefore, estimate with accuracy the costs attributable to each individual member's demands.

In the present case the difficulties which the Court perceived in *Automobile Club of Michigan* and *American Automobile Association* have been entirely eliminated in the accounting system which these taxpayers have consistently employed. The records kept on individual students accurately measured the amount of services rendered—and therefore the costs incurred by the taxpayer—under each individual contract during each taxable year. But, we are told, there is a fatal flaw in the taxpayers' accounts in this case too: The individual contracts did not provide "for lessons on fixed dates . . . , but left such dates to be arranged from time to time by the instructor and his student." Yet this "fixed date of performance" standard, it turns out, actually has nothing whatever to do with those aspects of the taxpayers' accounting system which the Court ultimately finds objectionable.

There is nothing in the Court's opinion to indicate disapproval of the basic method by which income earned by the rendition of services was recorded. On the contrary, the taxpayers' system was admittedly wholly accurate in recording lessons given under each individual contract. It was only in connection with lessons which had not yet been taught that the taxpayers were "uncertain whether none, some or all" of the contractual services would be rendered, and the condemned "arbitrariness" therefore is limited solely to the method by which cancellations were recognized.[12] It is, of course, true of all businesses in

---

[12] The Court also urges that the taxpayers' treatment of the commissions paid to sales personnel and royalties paid to Arthur Murray, Inc., were inconsistent with an accrual accounting system. It should

142

which services are not rendered simultaneously with payment that the number and amount of cancellations are necessarily unknown at the time advances are received. But surely it cannot be contended that a contract which specified the times at which lessons were to be given would make any more certain how many of the remaining lessons students would in fact demand. Indeed, the Court does not suggest that a schedule fixing the dates of all future lessons would, if embodied in each contract, suffice to make petitioners' accounting system "clearly reflect income."

Instead, the cure suggested by the Court for the defect which it finds in the accounting system used by these taxpayers is that estimated cancellations should be reported as income in the year advance payments are received. I agree that such estimates might more "clearly reflect income" than the system actually used by the taxpayers. But any such estimates would necessarily have to be based on precisely the type of statistical evaluations which the Court struck down in the *American Automobile Association* case. Whatever other artificialities the exigencies of revenue collection may require in the field of tax accounting, it has never before today been suggested that a consistent method of accrual accounting, valid for purposes of recognizing income, is not equally valid for purposes of deferring income. Yet in this case the Court says that the taxpayers, in recognizing income, should have used the very system of statistical estimates which,

be noted that § 1.461-1 (a)(3), Treas. Reg., 1954 Code, specifically provides: ". . . However, in a going business there are certain overlapping deductions. If these overlapping items do not materially distort income, they may be included in the years in which the taxpayer consistently takes them into account." If, however, the Court is holding that these items do "materially distort income," then the case should be remanded for recomputation as to these items.

for income deferral purposes, the *American Automobile* decision held impermissible.

It seems to me that this decision, the third of a trilogy of cases purportedly decided on their own peculiar facts, in truth completes the mutilation of a basic element of the accrual method of reporting income—a method which has been explicitly approved by Congress for almost half a century.[13]

I respectfully dissent.

---

[13] See § 13 (d) of the Revenue Act of 1916, 39 Stat. 771.