**In re KROH BROTHERS DEVELOP-MENT CO., Debtor.**

**KROH BROTHERS DEVELOPMENT CO. and The Kroh Operating Limited Partnership, Plaintiffs,**

v.

**NATIONAL FIDELITY LIFE INSURANCE CO., Defendant.**

**Bankruptcy No. 87–00640–1–11.**
**Adv. No. 90–4021–1–11.**

United States Bankruptcy Court, W.D. Missouri.

July 6, 1990.

Steven H. Mustoe, McDowell, Rice & Smith, Kansas City, Mo., for plaintiffs.

Richard A. Drews, Brashear & Ginn, Omaha, Neb., for defendant.

## MEMORANDUM OPINION

KAREN M. SEE, Bankruptcy Judge.

Debtor Kroh Brothers Development Company, renamed the Kroh Operating Limited Partnership ("Kroh") after confirmation of its Chapter 11 plan, sued defendant National Fidelity Life Insurance Company ("NFL") to recover, pursuant to 11

U.S.C. §§ 547 and 550, four alleged preferential transfers made by Kroh to NFL within 90 days and one year before the date of Kroh's bankruptcy petition. Three issues are pending: (1) whether Kroh established all the elements of § 547(b); (2) whether the insider preference provision of § 547(b)(4)(B) should be extended to include non-insider transferees under § 550; and (3) if plaintiffs have met their burden under § 547(b), whether defendant established its affirmative defense that the transfers were made in the ordinary course of business.

Kroh has not met its burden of proof under § 547(g) to establish the preference elements of § 547(b)(1) and (5). Accordingly, it is not necessary to reach the issue of whether a non-insider "expanded preference" is recoverable under § 550. Pursuant to FRCP 52 and Bankruptcy Rule 7052, the court makes the following findings of fact and conclusions of law.

## FACTS

In 1983 Kroh borrowed from NFL[1] the principal sum of $2.7 million secured by a shopping center in Colorado. Loan documents included a note, deed of trust and security agreement, plus an assignment by which NFL became the lender by assignment from Charter American Mortgage Company. The loan was nonrecourse. The note, deed of trust and security agreement each contained a clause by which lender NFL waived any and all right to obtain a personal or deficiency judgment against Kroh "or anyone else" and agreed to look exclusively to the shopping center property in the event of default in payments. Kroh was obligated to make payments of interest only for the first five years.

From the inception of the loan, the parties contemplated that Kroh would subsequently establish a limited partnership to which the shopping center would be transferred. In September, 1985, the Ken Caryl Associates Limited Partnership (the "partnership") was formed. Pursuant to a Real Estate Purchase and Sale Agreement dated September 19, 1985, Kroh conveyed the shopping center to the partnership. Kroh was the general partner and the Manfuso family was the limited partner.

The purchase price for sale of the property by Kroh to the Ken Caryl Associates Limited Partnership was $2.7 million, which was the same amount as the balance Kroh owed NFL on the note. Kroh and the partnership agreed that Kroh would retain sole and exclusive liability on Kroh's note to NFL. Upon conveyance of the shopping center to the partnership, the partnership specifically and expressly did not assume general partner Kroh's debt to NFL. Paragraph 4(b) of the Real Estate Purchase and Sale Agreement stated: "Notwithstanding anything else herein to the contrary, the purchaser is not assuming said first mortgage indebtedness and shall not have any personal obligation for the payments thereof."

In connection with conveyance of the shopping center from Kroh to the partnership, general partner Kroh gave the partnership a guaranty against cash flow deficits. The guaranty provided that in certain circumstances, Kroh would cover the partnership's cash flow deficits with additional capital contributions. The guaranty stated that any payments by general partner Kroh were not to be considered loans or advances but were to be capital contributions.

General partner Kroh continued to manage the property; it was entitled to various commissions and fees for management and leasing. Kroh also managed other properties owned wholly by Kroh and as general partner in other limited partnerships. Kroh commingled its own funds and funds from all the partnerships in one account. Payments of all types, including debt service and operating expenses, pertaining to the various partnership properties and Kroh obligations were not paid out of separate accounts for each partnership or property, but rather were paid at Kroh's convenience out of the giant commingled account.

---

1. In 1985, Lumbermen's Investment Corporation purchased NFL, acquiring all loans in NFL's portfolio, including the loan to KBDC. That transaction is not pertinent to the issues herein.

Prior to 1986, the limited partnership had no bank accounts. All income generated by the shopping center before, during and after the disputed transfers was immediately appropriated by Kroh and deposited in the Kroh account. Funds were commingled with income from other properties owned by Kroh wholly or as a partner in other partnerships, together with other funds such as loan proceeds, interest earned on investments, note payments, and management fees. Income generated by the shopping center was never in possession or control of the partnership and was not traceable to or earmarked as property of the partnership.

Payments were due the first of each month. From late 1985 through the date of Kroh's bankruptcy filing in February, 1987, NFL received payments from Kroh which were posted as follows: November 15, 1985, December 9, 1985, January 6, 1986, February 6, 1986, March 13, 1986, April 10, 1986, May 15, 1986, July 14, 1986, August 26, 1986, September 2, 1986 and October 13, 1986.

When Kroh was unable to make the June, 1986 payment, NFL agreed that Kroh could skip it, but that future monthly payments were to be made as usual and the June payment was to be made up by the end of the year. After June, four monthly payments were made, but in the records of both Kroh and NFL, the June payment was not shown as skipped. Rather, each payment was applied to the previous month's payment. From July through October, Kroh issued and dated the check in one month, but held it for delivery until the following month. For example, a check for the June payment was issued and dated in June, but was not delivered until July 14; a check for the July payment was issued and dated in July, but was not delivered until August 26. After October's payment, which was applied as the September payment, no further payments were made to NFL and in February, 1987, Kroh filed its bankruptcy petition.

Approximately three and one half months after the last transfer, and two weeks before Kroh filed bankruptcy in February, 1987, the partnership conveyed the shopping center back to Kroh. NFL fore- closed on the property on September 25, 1987 and one year later, in August, 1988, transferred it, by an inter-company transfer, to an affiliate company. The transfer was recorded in company records for $2,300,000.

Debtor seeks to recover the last four payments, totalling $115,875.04, made from July through October, as transfers which occurred in the insider preference period between 90 days and one year before the date of Kroh's bankruptcy petition.

## EXPANDED PREFERENCE

The parties stipulated that Kroh was insolvent at the time of the transfers and that the limited partnership was an insider of Kroh, its general partner. *See* 11 U.S.C. § 101(30)(B)(iv). Kroh's Complaint includes the following allegations:

1. That the partnership and Kroh were jointly and severally liable to NFL on the note.

2. That the partnership was the holder of a contingent claim against Kroh in the event that the partnership should be called upon to satisfy their mutual obligation to NFL and therefore, the partnership was a creditor of Kroh. *See* 11 U.S.C. § 101(4), (9).

3. That the partnership benefited from the transfer by Kroh to NFL, and the transfers enabled the partnership to receive more than it would have in a Chapter 7 liquidation of Kroh's estate had the transfers not been made.

In short, debtor alleges that pursuant to §§ 547 and 550, four transfers by Kroh during the one year insider preference period of § 547(b)(4)(B) should be recovered from NFL, a non-insider of debtor, because the partnership, an insider-creditor, benefited from the transfers.

In the typical insider preference action, an insider is a maker, co-maker, guarantor or surety of a debt owed by the debtor to a third party or "outside creditor." Debtor's transfer to the outside creditor in repayment of the debt benefits the insider by reducing or discharging the insider's personal liability as maker, co-maker, guarantor or insurer. *See, e.g., Ray v. City Bank*

& Trust Co. (In re C–L Cartage Co., Inc.), 899 F.2d 1490, 1492, 1494–95 (6th Cir.1990); *Lowrey v. First National Bank of Bethany (In re Robinson Brothers Drilling, Inc.),* 97 B.R. 77, 79–80, 82–83 (W.D.Okla. 1988), *aff'd,* 892 F.2d 850 (10th Cir.1989); *Levit v. Ingersoll Rand Financial Corp. (In re V.N. Deprizio Const. Co.),* 874 F.2d 1186, 1190, 1190 n. 4, 1194 (7th Cir.1989).

*Deprizio, C–L Cartage* and *Robinson* hold that because of such benefit to an inside creditor, the debtor's transfer to an outside creditor more than 90 days before bankruptcy can be recovered from the outside creditor, as the immediate transferee of the transfer. Underlying the typical insider preference is the likelihood that in the period preceding bankruptcy, an insider-guarantor is both motivated and able to cause the debtor to pay down those debts on which the insider-guarantor is also liable. This rationale for recovery of insider preferences from the non-insider transferee recognizes that insiders are likely to direct the debtor's allocation of resources in favor of the insider's interests as the debtor's resources shrink. *C–L Cartage,* 899 F.2d at 1495; *Deprizio,* 874 F.2d at 1195; *Robinson,* 97 B.R. at 82–83 n. 5.

Prior to trial, NFL moved to dismiss the complaint based on a District Court decision in the Western District of Missouri, *Block v. Texas Commerce Bank Nat'l Ass'n (In the Matter of Midwestern Cos., Inc.),* 102 B.R. 169 (W.D.Mo.1989), which is contrary to the *DePrizio* line of Circuit-level cases and is the highest authority in the Eighth Circuit. *Midwestern,* 102 B.R. at 171, 173, held that a non-insider transferee is not liable under §§ 547 and 550 for transfers to it more than 90 days prior to the transferor's bankruptcy, regardless of any incidental benefit to an insider of the transferor.

▮ *Midwestern* rejected *DePrizio,* which then was the only Circuit-level deci-sion. However, after *Midwestern* the Sixth and Tenth Circuits in *C–L Cartage* and *Robinson* joined the Seventh Circuit in holdings contrary to *Midwestern,* so this court denied NFL's motion to dismiss but indicated the issue would be revisited at trial. Now after trial it is not necessary to decide the ultimate question of whether the expanded preference period applies to an outside creditor, i.e. whether to follow *Midwestern* or the contrary *Deprizio, Robinson,* and *C–L Cartage* cases, because debtor failed to establish the elements of a preference.[2]

## BENEFIT TO INSIDER–CREDITOR

In order to recover transfers made during the expanded preference period from NFL, a non-insider, Kroh must show that the transfers benefited an insider-creditor of debtor. 11 U.S.C. § 547(b)(1). Kroh—debtor and general partner—tried this case on the theory that the limited partnership, as insider-creditor, benefited by Kroh's payments to NFL. In addition to establishing that the partnership was a creditor, under §§ 547(b)(1) and (5) Kroh was required to establish that the transfers benefited the partnership, and that the transfers enabled the partnership to receive more than it would have received in a Chapter 7 liquidation of Kroh's estate had the transfers not been made.

Kroh was required to prove by a preponderance of the evidence these "creditor" and "benefit" elements of § 547(b)(1) and (5). *Braniff Airways, Inc. v. Exxon Co.,* 814 F.2d 1030, 1034, n. 3 (5th Cir.1987); *In the Matter of Prescott,* 805 F.2d 719, 726 (7th Cir.1986). Kroh failed to sustain its burden of proof. Kroh failed to show that the partnership was a creditor of the debtor or that the partnership received any benefit from the transfers to NFL.

---

**2.** As to whether this bankruptcy court would have been bound to follow the Western District of Missouri District Court opinion in *Midwestern,* which is also the highest decision in the Eighth Circuit, as opposed to conflicting Circuit decisions from outside the Circuit, no cases directly on point were found. However, adherence to the highest authority in one's own Circuit cannot be lightly abandoned. As stated in *Colby v. J.C. Penney Co.,* 811 F.2d 1119, 1123 (7th Cir.1987): "[N]either this Court, nor the District Court of this Circuit, gives the decisions of other Courts of Appeals automatic deference. We recognize that within reason the parties to cases before us are entitled to our independent judgment."

## PARTNERSHIP NOT A CREDITOR

■ All relevant documents establish that the partnership was not liable on the debt to NFL. The 1983 note, deed of trust and security agreement each contained a clause by which the lender NFL waived any and all right to obtain a personal or deficiency judgment against Kroh "or anyone else" and agreed to look exclusively to the shopping center property in the event of default in payments.

In addition to the nonrecourse nature of the loan, upon conveyance of the shopping center to the partnership, the partnership specifically and expressly did not assume Kroh's debt to NFL. Paragraph 4(b) of the Real Estate Purchase and Sale Agreement stated: "Notwithstanding anything else herein to the contrary, the purchaser is not assuming said first mortgage indebtedness and shall not have any personal obligation for the payments thereof." Kroh offered various items of evidence at trial in an effort to rebut Paragraph 4(b) of the Real Estate Purchase and Sale Agreement and the nonrecourse provisions of the loan documents. However, the loan documents and Real Estate Purchase and Sale Agreement speak for themselves and unambiguously provide that the partnership was not liable to NFL jointly with or in lieu of Kroh on the note.

Unlike the usual insider preference fact pattern, the insider partnership had no contingent liability to outside creditor NFL in the event of debtor's default in payment. Debtor Kroh's debt to NFL was both nonrecourse and never assumed by the partnership, so the typical insider benefit is missing in this case.

## NO ADMISSION OF PARTNERSHIP CREDITOR STATUS

■ Kroh argues that NFL is bound by the admission of joint and several liability in its original Answer, and that it also irrevocably admitted liability by filing identical proofs of claim in 1987 in both the Kroh and Ken Caryl Associates Limited Partnership bankruptcy cases, three years before this adversary action was filed in 1990.

Before trial NFL moved to amend its Answer to deny that the partnership was jointly and severally liable with Kroh on the note to NFL. After the close of evidence, NFL was permitted to amend its Answer to conform to the evidence. F.R. C.P. 15(b); Bankruptcy Rule 7015. NFL is not bound by an obviously incorrect admission in its original Answer when it sought in a timely manner to withdraw that admission before trial. Kroh suffered no prejudice or surprise from the amendment, as all documents reflecting the absence of partnership liability on the note were in Kroh's possession from the time of their creation, and several weeks before trial NFL notified Kroh of its intent to amend its Answer to conform to the evidence.

■ As to the fact that in 1987, right after the bankruptcy cases were filed, NFL filed proofs of claim in both the partnership and Kroh bankruptcy cases, the court concludes that NFL is not bound to an admission which is contrary to all the other evidence. Except for the proofs of claim filed in both bankruptcies, all other credible evidence indicated that Kroh and the partnership agreed that the partnership would not assume liability on the note and that general partner Kroh would continue to be solely liable.

■ Kroh argues that a claim which is not objected to is prima facie evidence of the validity of the claim, and therefore, NFL has admitted it considered the partnership jointly liable on the note. The evidence was simply that NFL indicated it would consent to conveyance of the property by Kroh to the limited partnership. For purposes of argument, even if NFL mistakenly thought the partnership was jointly liable (which is not supported by the evidence), that incorrect assumption would not be a binding admission. The critical intentions are those of Kroh and the partnership, and they agreed that the partnership was not liable.

In 1987 when about 35 Kroh-related bankruptcies were filed, the affairs of Kroh and its numerous limited partnerships were in a state of extreme confusion. A claims bar date was ordered to compel par-

ties to file claims in order to assist in getting matters sorted out. Many creditors filed claims in multiple cases in order to avoid missing a bar date at a time when facts were still not clear on many of the debtor-creditor relationships. NFL may have filed dual claims out of ignorance, a mistaken assumption or an abundance of caution. It would have been better practice to seek to withdraw the claim in the partnership's case in 1990 once NFL had determined the partnership was not liable. However, where the evidence clearly indicates that general partner Kroh and the limited partnership agreed that the partnership would not assume any liability on the note, and NFL never looked to the partnership for payment on the note, it would be inequitable to ignore the facts and bind NFL to a mistake in a proof of claim filed in 1987 when matters were confused on all sides.

## NO BENEFIT TO PARTNERSHIP

As explained above, there was no benefit to the partnership in the form of reduction of liability because the partnership was not liable on Kroh's obligation to NFL, having expressly provided that it did not assume the liability on the note when the shopping center was transferred from Kroh to the partnership. Moreover, the interest-only payments did not reduce any liability or build any equity in the property for the partnership.

Kroh also argues that the transfers enabled the partnership to receive tax benefits. However, the alleged tax benefits to the partnership actually consisted of tax losses in the form of depreciation which flowed through the partnership to the individual partners. Any tax benefits accrued to the individual partners and not to the partnership.

Section 26 U.S.C. § 701 provides: "A partnership as such shall not be subject to the income tax imposed by this chapter. Persons carrying on business as partners shall be liable for income tax only in their separate or individual capacity." "A partnership is a legal entity separate from its partners." *Campbell v. Bolen (In re Caudy Custom Builders, Inc.),* 31 B.R. 6, 9 (Bankr.D.S.C.1983). A "partnership is not

a taxable entity, the partners being liable in their individual capacities for their distributive share of partnership income.... [T]he proper statement of the partnership's income affects only the tax liabilities of the partners individually." *Schlude v. Commissioner,* 372 U.S. 128, 129 n. 1, 131 n. 4, 83 S.Ct. 601, 602 n. 1, 603 n. 4, 9 L.Ed.2d 633 (1963). The partnership as an entity did not receive any tax loss benefit pursuant to § 547(b)(1). Tax losses belonged to the individual partners, not the partnership as an entity. A partnership, which is not a taxable entity, is required simply to file an informational return.

Kroh has never contended that the limited partner was the insider-creditor of debtor which received the alleged tax benefit pursuant to § 547(b)(1) and (5). The general partner cannot serve as the insider-creditor because the general partner, Kroh, is the debtor herein.

The partnership did not benefit from income-related incidents of ownership because the partnership lacked certain usual incidents of ownership. Prior to December, 1986, the partnership had no bank accounts. All income generated by the shopping center before, during and after the transfers was immediately appropriated by general partner Kroh and deposited into a Kroh commingled account. The funds were commingled with income from other properties owned by Kroh wholly or as a partner in other partnerships, together with loan proceeds, interest earned on investments, note payments, and management fees. Income generated by the shopping center was never in the possession or control of the partnership and was not traceable to or earmarked as property of the partnership at any time.

At most, the interest payments by Kroh to NFL resulted in retention of the shopping center by the partnership for a few months before the property was reconveyed to Kroh two weeks before bankruptcy was filed. However, the continued retention of the property resulted in no benefit to the partnership since there was no income retained by the partnership, no distribution to the partners (if a distribution to

the partners can be considered a benefit to the partnership), no tax benefit to the partnership, no reduction of any partnership liability and no increase in equity. The transfers were merely payments made by Kroh on its own antecedent debt to NFL.

Kroh asserts that its transfers to NFL were in reality payments to or on behalf of the partnership pursuant to a Guaranty Agreement Against Operating Deficits provided to the partnership by general partner Kroh. However, when read in conjunction with the Partnership Agreement, the guaranty required Kroh to make certain capital contributions to the partnership in specified circumstances. The guaranty stated payments by Kroh would not be considered loans or advances, but would be capital contributions. Kroh was not required or authorized to direct to a third party such payments as the general partner owed to the partnership or to fulfill the guaranty obligations in some form other than by making capital contributions directly to the partnership. Therefore, it would be purely speculative to regard Kroh's payments on Kroh's own indebtedness as the satisfaction of Kroh's capital contribution obligations to the partnership under the guaranty. In any event, Kroh failed to sustain its burden of proof that the transfers constituted anything other than payment by Kroh on its own indebtedness to NFL, which enabled Kroh to continue to obtain the income from the shopping center and to deposit it in the commingled account for the benefit of Kroh, which was, as an owner and general partner in other partnerships, responsible for making payments on other properties (for which Kroh received fees and commissions).

## HYPOTHETICAL CHAPTER 7 DISTRIBUTION

■ As *Deprizio*, 874 F.2d at 1199, points out, "under § 547(b)(5) a transfer is avoidable only to the extent the creditor received more than it would have in a Chapter 7 liquidation." Since the partnership was neither a creditor nor did the partnership receive any benefit from the transfers, the hypothetical Chapter 7 distribution element under § 547(b)(5) also cannot be met. In light of the above facts,

findings of benefit to the partnership under § 547(b)(1), and that the transfers enabled the insider partnership to receive more than it would have received in a Chapter 7 liquidation of the Kroh estate absent the transfers under § 547(b)(5), would be purely speculative and are not supported by the evidence.

## FULLY SECURED OUTSIDE CREDITOR

■ In addition to the absence of measurable benefit to the partnership from the transfers, outside creditor NFL was fully secured. As *Deprizio*, 874 F.2d at 1199–1200, notes, "if the [outside] creditor was fully secured, then payment [by debtor] does not produce a benefit for the inside guarantor [or creditor], whose exposure was zero."

Each party presented an appraisal. NFL valued the shopping center at $2,631,000; Kroh valued it at $2,300,000. The relatively small difference in valuations is significant since the debt was $2,575,000 and the choice of appraisal will determine whether NFL was fully secured.

NFL's expert appraised the property while working as a full time appraiser in Colorado, the site of the property. He had substantial experience appraising similar properties and prepared his appraisal in May, 1987, only a few months after the time of the transfers, and without any knowledge that it would be used in litigation such as this adversary proceeding. Thus, NFL's appraiser had no incentive to arrive at a higher valuation for NFL's benefit in litigation.

Kroh's appraiser, who is from Kansas City, prepared his appraisal in June 1989, long after commencement of the Kroh bankruptcies, at which point litigation in this matter was a foreseeable prospect. In fact, when Kroh's appraisal was rendered in 1989, an action concerning this property was pending against another party. That action was eventually dismissed and the present action against NFL was filed. The 1989 appraisal for Kroh was given an effective date of January 1987.

Both experts adjusted their valuations in light of a subsurface problem connected with an abandoned mine located underneath the property.

In the income method to valuation, net income is converted to a valuation figure by means of a capitalization figure commonly referred to as a "cap rate." Without detailing the mathematical steps for determining a cap rate and a valuation figure by application of that cap rate, suffice to say that the higher the cap rate, the lower the valuation will be and conversely, the lower the cap rate, the higher the valuation will be.

Kroh contends, in a motion to reconsider, that its appraiser is more credible because he used a lower cap rate in calculating value by the income approach. Kroh argues that its appraiser could have used a higher cap rate and come up with an even lower value. Kroh's arguments on cap rates are without merit. Both appraisers used cap rates which were in the normal range. In fact, one could turn Kroh's argument around and consider NFL's appraiser more credible because he used a higher cap rate, which conversely results in a lower, perhaps more conservative, valuation figure. That higher cap rate and his resulting lower value figure were used in circumstances where the NFL appraiser was not determining the value for litigation purposes as was Kroh's appraiser.

Kroh also argues that when its appraiser valued the property in 1989, three years after the first transfer, its appraiser used supposedly more accurate vacancy rates because in hindsight, the appraiser was able to factor in changes in the leasing market in Colorado and the subsequent rise in vacancy rates. Again, the court notes that the higher vacancy rate chosen for Kroh's valuation was chosen with the benefit of hindsight and after Kroh knew it would litigate over the value of this property.

NFL's appraisal valued the property in light of vacancy rates which were appropriate for 1986 and 1987, when the appraisal was made, and reasonable projected vacancy rates, based on current market conditions and forecasts, and without benefit of knowledge that the appraisal would be used in litigation where a higher valuation was desirable. In this case it is not reasonable after the fact to isolate one factor, such as the vacancy rate, from the myriad of complex factors which constitute the valuation process, and to unduly emphasize that one factor as a basis for rejecting the entire valuation where there is nothing inherently incorrect about the factor other than that it differs from Kroh's estimate.

Professional appraisers generally refer to three methods in arriving at a final valuation: the income, market data and cost methods. One method may be given particular emphasis in appropriate circumstances, such as here, where both appraisers relied heavily on the income method because an income-producing commercial property was involved. While values from the three methods may vary, they generally should be in the same range. This correlation among the three methods is a guide to determine the basic integrity of the appraisal. In fact, the final valuation is usually a reconciliation of the three approaches. Looking at all the facets of NFL's appraisal as a whole, the various factors used by NFL's appraiser are consistent and logical, and in consideration of all the circumstances discussed above, comprise a more credible valuation. NFL's appraisal based on the income approach was $2,672,000. The final valuation, resulting from reconciliation of differences in the three valuation methods, was $2,631,000.

Kroh also argues that after foreclosing on the property in September, 1987, NFL "sold" it for $2,300,000, thereby establishing its market value. This argument is without merit for two reasons. First, that conveyance occurred two years after the transfers, in August, 1988. Second, the undisputed evidence was that the post-foreclosure transfer on company records was an "in-house" or inter-company transfer, not at market value, from NFL to one of its affiliate companies. There was no sale on the open market at arm's length from a willing seller to a willing buyer.

Lastly, Kroh argues in the motion for reconsideration that the testimony of both

parties' experts was "merely evidence of value" and that in effect, the court should disregard both experts and engage in speculation by assuming that after the Tax Act of 1986 a competent buyer would not have purchased the property. Kroh did not present any information on how the change in tax laws affected this particular piece of property and it was not addressed by Kroh's expert as a factor in valuing the property. To now request after trial that both experts be disregarded and that the court assume the property was not saleable is not reasonable.

The court finds NFL's appraisal more persuasive and adopts the reconciled valuation of $2,631,000. The court also finds, pursuant to the testimony of NFL's appraiser, that the shopping center had the same value when the transfers occurred as on his appraisal date a few months later.

At the outset of the loan transaction, the principal amount of Kroh's debt was $2.7 million. The parties stipulated that a $125,000 letter of credit provided at that time was subsequently paid, reducing the balance to $2,575,000.00. Therefore, the $2,631,000 value of the property exceeded the $2,575,000 balance of the debt. Since the outside creditor NFL was fully secured, the transfers could not have benefited the insider-creditor, the partnership, because it had no exposure on the obligation. Accordingly, Kroh has failed to demonstrate that NFL, a fully secured creditor, received more by the transfers than it would have received in a Chapter 7 proceeding.

## ORDINARY COURSE OF BUSINESS DEFENSE

■ As a final matter, assuming for purposes of argument that Kroh had established the elements of a preference, NFL failed to establish its § 547(c)(2)(B) affirmative defense that the transfers were made in the ordinary course of business. Kroh's debt to NFL was incurred in the ordinary course of the business or financial affairs of both Kroh and NFL. However, the transfers were not made in the ordinary course of business. Prior to the transfers, previous payments were received within six to 15 days of the due dates. These four transfers were delivered to NFL between 44 and 56 days after the due dates. The payments were so late because the June payment was skipped, with NFL's consent, and each subsequent payment was recorded as the previous month's overdue payment in both NFL and Kroh records. For example, the June 1 payment was made July 14, and the July 1 payment was made August 26.

In addition, prior to delivery of the four transfers, Kroh held each check for several weeks because there were not sufficient funds to clear the checks. The check for each payment was issued and dated at the time the payment was due, but it was not delivered to NFL until the following month. For example, the check for the July 1 payment was cut in July with a July date, but was not delivered until August 26. Holding checks for a significant time due to lack of funds to clear the checks is outside the ordinary course of business.

NFL argues that the transfers were in the ordinary course of its business because the agreement to skip the June payment and the decision to apply each subsequent check to the previous month's payment was how NFL customarily treated problem loans. The fact that this is how problem loans were treated is not determinative. The controlling factor is how the payments on the loan were treated before the loan assumed the status of a problem loan. To determine whether payments on the note were made in the ordinary course of business as between these two parties, it is necessary to look to the payment history for the time before the preference period and before the operation became obviously troubled, to see how the parties dealt with the payments when they thought payments were being made under normal circumstances.

## MOTION TO AMEND AND FOR RECONSIDERATION OF JUDGEMENT

After the court announced its decision on the record after trial, and before preparation of these written findings, plaintiff pre-

maturely filed a motion to amend and reconsider the judgment. The points raised in that motion are covered in this opinion.

For the foregoing reasons, it is hereby ORDERED that judgment on plaintiffs' complaint is entered in favor of defendant National Fidelity Life Insurance Company, and against plaintiffs, with costs against plaintiffs; and further

ORDERED that plaintiffs' motion to amend and for reconsideration of judgment is denied.