*Decisions will be entered under Rule 50.*

BROOKS-MASSEY DODGE, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 489–71. Filed September 17, 1973.

*William R. Frazier*, for the petitioner.
*Robert J. Shilliday, Jr.*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioner's corporate income taxes in the amounts of $30,411.83 and $16,318.75 for the tax years 1967 and 1968, respectively. Petitioner has abandoned one issue on brief, and two questions remain for our decision:

---

[7] SEC. 6651. FAILURE TO FILE TAX RETURN.

(1) Whether petitioner may use a hybrid form of the cash receipts and disbursements method of accounting to reflect income from manufacturer discount holdbacks on automobiles purchased from the manufacturer and sold to customers.

(2) Whether petitioner may use 80 percent of the NADA wholesale value as the adjusted yearend value of its used-car inventory or must use 100 percent of that value as determined by respondent.

If we sustain either of respondent's changes to petitioner's accounting procedures, as set out in the first two issues, then we will examine the adjustments respondent made pursuant thereto and decide whether they are the proper adjustments under section 481, so as to prevent amounts from being duplicated or omitted from petitioner's 1966 gross income.

### FINDINGS OF FACT

The stipulated facts and accompanying exhibits are incorporated herein by this reference.

Petitioner Brooks-Massey Dodge, Inc., is a corporation organized and existing under the laws of the State of Florida, with its principal office located in Tampa, Fla. During the years in issue, petitioner filed its Federal corporate income tax returns on a calendar year basis with the Internal Revenue Service Southeast Service Center in Chamblee, Ga., reporting its income primarily under the accrual method of accounting.

Petitioner was chartered on August 31, 1961, under the name of Massey Motors, Inc., of Tampa. By charter amendment, its name was subsequently changed to Brooks-Massey Dodge, Inc. Since the date of its organization, petitioner has been a retail dealer of new and used vehicles and has engaged in the business of acting as a franchised Dodge automobile dealer under a sales agreement from the Dodge Division of Chrysler Motors Corp. (hereinafter Dodge).

Petitioner maintains its books and records on an accrual basis of accounting with the exception of one account which reflects discount holdbacks on vehicles bought from Dodge. When petitioner receives a new vehicle from Dodge, it is placed in inventory at factory invoice cost which becomes petitioner's final inventory cost, if no additional equipment or labor costs are attributable to the vehicle. Dodge provides petitioner with a manufacturer's suggested list price for each new vehicle it sells to petitioner. The cost of the new Chrysler product to a dealer such as petitioner would normally be the suggested list price less a 25-percent (23 percent on Lancers) dealer's discount. However, for reasons hereafter mentioned, Dodge "withheld" 2 to 2½ percent of that discount and invoiced petitioner for the list price (plus destination charges), less only 23-percent or 22½-percent dis-

count, which becomes petitioner's final inventory cost for the new vehicle.

The discount holdback is a part of the overall discount enjoyed by all dealers of Dodge vehicles, and it is inconspicuously noted on each invoice that petitioner receives. The purpose of the discount holdback is to place Dodge dealers in a better competitive position with their rivals by placing an artificially high floor on the invoice cost of new vehicles and making it appear that each vehicle costs the dealer more than it actually does. Thus, the portion of the discount which is held back by Dodge on the sale of its cars and trucks to its dealers enables them to make an automatic minimum profit on each sale to their customers, since it is unusual for a new vehicle to be sold at less than factory invoice cost. An additional reason for the discount holdback is that Dodge dealers have found it convenient to have a surplus cash account available to them for payment of their obligations at yearend. In this respect, the discount holdback serves as a savings account for the dealers, though it earns no interest.

Under the discount holdback procedure, Dodge normally accrues the portion of the dealers' discount which is held back and pays it to them at the end of the model year, which occurs in September. However, upon request, any dealer may have its accrued discount holdbacks paid at an earlier date, either quarterly or monthly.

During the years in issue, Dodge treated the discount holdbacks as property of the dealers upon the sale of each new vehicle to them. On all new vehicle transactions, Dodge reduced the amount of its sales by the entire amount of the dealers' discount, including the discount holdback, and established a provisional account for the benefit of the dealers to maintain the discount holdback funds until their eventual payment.

During the years in issue, Dodge allowed its dealers a total discount of 25 percent of the suggested list price for all vehicles except its Lancer model, which was discounted at a rate of 23 percent. From January 1, 1966, to August 16, 1968, Dodge held back 2 percent of the dealers' discount on its vehicles.[1] At the request of the dealers, the discount holdback was increased to 2½ percent in August 1968 and continued at that figure during the remainder of the period in issue.

Petitioner does not use the accrual method of accounting to account for the amounts it receives as discount holdbacks. Instead it uses a procedure whereby it reports the discount holdbacks as income at the time a new vehicle is sold or at the time the funds are received from

---

[1] The discount holdback applied only to the base price of the vehicles and did not include any of the dealers' discount attributable to optional equipment and accessories, such as radios, air-conditioning, power brakes and steering, etc., excise taxes, handling charges, and other miscellaneous charges.

Dodge, whichever occurs last. If a new vehicle is sold before the hold-back funds attributable to it are received by petitioner, no entry is made in petitioner's books to reflect the additional profit made on the car. Subsequently, when the funds are received from Dodge petitioner records them in its books as miscellaneous income. Conversely, if the discount holdback attributable to a new vehicle is received before the new vehicle is sold, no income is recorded in the petitioner's books until the vehicle is sold, and then only if the sales transaction does not involve a trade-in. In the latter case, the funds are held in a debit account until the sale. Petitioner's accounting treatment of the discount hold-backs has been approved by its parent company, Massey Motors, Inc., and petitioner has consistently used this accounting procedure since its inception. Furthermore, Dodge has shown no disapproval of petitioner's accounting treatment of the discount holdbacks.

During the period in issue, petitioner received the following amounts from Dodge which represented payment of dealer's discounts previously held back:

| Year of payment | Year holdback account established by Dodge | Amount |
|---|---|---|
| 1967 | 1966 | $13,541.44 |
| 1968 | 1967 | 26,524.96 |
| 1969 | 1968 | 43,922.02 |

These amounts were recorded in a manner consistent with petitioner's discount holdback procedure.

Throughout its corporate existence, petitioner has employed the same business and accounting practice to account for sales of its new and used vehicles. On the sale of a new vehicle where no trade-in is involved, petitioner deducts its inventory cost of the vehicle (which includes the holdback) from the cash sales price to the customer to arrive at its gross profit on the transaction, which it includes in income at that time. On the other hand, where a new vehicle is sold in a transaction in which a used vehicle is taken in trade, petitioner uses the inventory cost of the new vehicle, less moneys received, to arrive at the inventory cost of the used vehicle. No profit is recognized by petitioner on the sale of a new vehicle where a used vehicle is taken in trade until the used vehicle is sold or otherwise disposed of with no trade-in involved. Therefore, in the case where the money received in a transaction which involves a trade-in exceeds the inventory cost of the new vehicle sold, the used vehicle taken in trade by petitioner will be carried on its books at a minus-cost basis. Any repairs made to a used vehicle are charged to its inventory cost.

At the end of each calendar year of operation, including the calendar years ended December 31, 1967, and December 31, 1968, petitioner takes a physical inventory of all used vehicles on hand and marks the inven-

tory value of each vehicle up or down to reflect an amount equal to 80 percent of its National Automobile Dealers Association (NADA) average wholesale value. All wrecked or substandard vehicles in petitioner's inventory are valued at 80 percent of their NADA wholesale value, or actual fair market value, whichever is less. The closing inventory thus determined becomes the opening inventory for all of the used vehicles carried into the succeeding year. The used-vehicle inventory values determined are used to compute petitioner's gross profit or loss from operations. Petitioner has consistently followed its method of accounting for its used-vehicle inventory, for the procedure is prescribed and required in the dealer's operational manual of Massey Motors, Inc., petitioner's parent corporation.

In addition to the used vehicles taken in trade on the sale of new vehicles, petitioner acquires used cars by purchase at auctions held by the Chrysler Leasing Corp. Normally, petitioner pays more than NADA wholesale value for the used cars purchased at auction, but all used vehicles in its inventory at yearend are revalued at 80 percent of NADA wholesale value, unless they are wrecked or substandard.

During the years in issue the condition of the vehicles in petitioner's used-car inventory ranged from above average to below average. However, there were more used vehicles in inventory with preinventory values above 80 percent than below 80 percent of NADA wholesale value.

During the years in issue, petitioner's valuation of its ending inventory varied from the NADA valuation and the subsequent actual sales price of the used vehicles as follows:

| Year ending Dec. 31— | Petitioner's value | NADA value | Sales price |
|---|---|---|---|
| 1967 | $134,832.03 | $168,540.04 | $183,298.52 |
| 1968 | 176,370.73 | 220,463.41 | 236,218.86 |

Additionally, petitioner's opening inventory of used vehicles in January 1967 was $13,192.69 less than the NADA average wholesale value, which reflected petitioner's computation of used-vehicle inventory value using a 20-percent reduction of NADA average wholesale value in 1966.

The NADA average wholesale values used to compute the value of petitioner's ending inventory in 1967 and 1968 were taken from the December issues of Car Guide for the same respective years. The Car Guide is published monthly for the Southeast, and it sets out the average wholesale value for each make and model based on car auction reports and dealer wholesale reports of actual wholesale prices received from the sale of used vehicles in the seven Southeastern States

for a given period. The Car Guide provides that the term "average" means vehicles in average condition, with average mileage being 15,000 per year. NADA average wholesale value for a particular vehicle is equal to the average loan value, i.e., the average credit that has been obtained during a given period on similar vehicles of average condition. The reliability of the data found in the Car Guide is checked periodically by certified public accounting firms in major markets throughout the country.

In his notice of deficiency dated October 22, 1970, respondent determined that petitioner's closing inventories for the years 1967 and 1968 should be increased by the respective amounts of $33,708.01 and $44,092.68, which equaled the difference between the full NADA values and the 80 percent used by petitioner. He further determined that discount holdbacks in the amounts of $26,524.96 and $43,922.02 accrued by Dodge in the years 1967 and 1968, respectively, but not reported by petitioner in the years accrued, should be included in petitioner's income for those years. Finally, under his powers derived from section 481, respondent determined that for the year 1967 additional income is includable in petitioner's return in the amounts of $13,192.69 and $13,541.44, for adjustments to petitioner's inventory and discount holdback accounts for 1966, respectively, to prevent such amounts from being omitted from income.

## OPINION

Respondent maintains the discount holdbacks credited by Dodge to petitioner's account were income to petitioner in the year of credit. He argues that since the discount holdbacks petitioner received were certain from the date it purchased a vehicle from Dodge, and since they were directly related to petitioner's principal business of selling cars and trucks, petitioner should have reported them under the accrual method of accounting it used to report other profits derived from car and truck sales. Respondent further contends petitioner has failed to show that its current accounting method clearly reflects income. Finally, respondent argues that even if petitioner is entitled to use the cash basis method of accounting for this item, it should nevertheless recognize the discount holdbacks in the year it purchases a vehicle from Dodge because it has constructive receipt of the amounts held back on the date of its purchase.

Petitioner is an accrual basis taxpayer and the general principles governing the accrual and reporting of income by taxpayers who employ the accrual basis have long been settled. *Security Mills Co.* v. *Commissioner*, 321 U.S. 281 (1944) ; *Spring City Co.* v. *Commissioner*, 292 U.S. 182 (1934) ; *Brown* v. *Helvering*, 291 U.S. 193 (1934). Essen-

tially, the controlling factor for reporting income under the accrual method of accounting is the fixed right to receive income, rather than actual receipt of the income. Thus, when a right to receive income becomes fixed, the item must be reported in gross income by an accrual basis taxpayer even if actual receipt is postponed. *Commissioner* v. *Hansen*, 360 U.S. 447 (1959); *Burrell* v. *Commissioner*, 400 F. 2d 682 (C.A. 10, 1968). See also *George K. Herman Chevrolet, Inc.*, 39 T.C. 846 (1963).

Petitioner does not contest these established rules, but argues that its consistent and uniform treatment of the discount holdbacks together with the liberal provisions of sections 446 and 451 give it ample grounds for its aberrational treatment of this one account. Such a technique, it is argued, clearly reflects income and is in keeping with good business practice and sound accounting theory. Accordingly, petitioner urges respondent's determination that it should maintain its books on a strict accrual basis is clearly erroneous and arbitrary.

We have carefully reviewed the evidence and the law concerning the instant question, and we conclude that neither sustains petitioner's arguments. At the outset, it is important to point out that section 446 (b)[2] gives respondent broad discretion in matters of accounting methods. *Schlude* v. *Commissioner*, 372 U.S. 128, 136 (1963); *American Automobile Association* v. *United States*, 367 U.S. 687 (1961); *Mooney Aircraft, Inc.* v. *United States*, 420 F. 2d 400 (C.A. 5, 1969). Respondent has a right to treat gross receipts differently for tax purposes than they are treated for normal accounting purposes if the normal accounting practice does not clearly reflect income. *Lincoln Electric Co.* v. *Commissioner*, 444 F. 2d 491 (C.A. 6, 1971). While it is true that sections 446 (a) and (c)[3] and 451(a)[4] allow taxpayers more flexibility in their accounting methods, and if read alone give support to peti-

---

[2] SEC. 446(b). EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

[3] SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

\* \* \* \* \* \* \*

(c) PERMISSIBLE METHODS.—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—

(1) the cash receipts and disbursements method;

(2) an accrual method;

(3) any other method permitted by this chapter; or

(4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary or his delegate.

[4] SEC. 451. GENERAL RULE FOR TAXABLE YEAR OF INCLUSION.

(a) GENERAL RULE.—The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

tioner's position, it is nevertheless quite evident that section 446(b) is an overriding consideration. Thus, respondent's determinations made pursuant to his authority under section 446(b) bear a presumption of correctness which stands unless petitioner is able to prove them clearly erroneous or arbitrary. Petitioner has been unable to do this.

The record makes it crystal clear that petitioner had a vested right to receive the discount holdbacks retained by Dodge on the purchase of each vehicle. Moreover, the amounts that petitioner was entitled to receive were fixed at 2 or 2½ percent of the base price of each vehicle, and petitioner was assured of receiving that amount at some time in the near future. Petitioner had liberal access to the funds and could reduce them to its possession within 60 to 90 days upon request to Dodge. The record discloses that Dodge treated the funds as petitioner's upon its sale of a vehicle, which is further evidence that petitioner clearly had an immediate right to receive the funds held back.

At trial, an additional perspective was added by the testimony of H. E. Parks, a vice president of Massey Motors, Inc., which further weakens petitioner's grounds for maintaining the discount account in an inconsistent manner. According to Parks' testimony concerning two letters from Dodge to petitioner offered into evidence, the discount holdback procedure was instituted at the request of Dodge's dealers so they would have an artificially high floor built into the invoice costs of their vehicles which would give them an automatic profit on every sale of a new vehicle, even if it were transacted at invoice cost. This devious practice gave the Dodge dealers a more competitive bargaining position with respect to dealers of other automobile manufacturers, but it had no legal effect on their entitlement to the funds held back, and did not alter their actual profit on the sale of each car or truck.

We have discussed accounting principles and methods at some length above because the parties devoted most of their arguments on brief to those subjects. Perhaps petitioner was entitled to do so in view of the fact that the wording of the notice of deficiency suggests that the adjustment with respect to the holdbacks is to include the amounts thereof in income in the years in which they are credited to petitioner's account by Dodge. It seems to us, however, that accounting principles and methods may have little to do with this issue. The holdback plan in reality simply gave rise to an artificial expense which petitioner included in cost of goods sold which could be corrected to clearly reflect income by either disallowing the amount of the holdback as a part of the cost of the new car or offsetting that cost with income in the same amount in the same year. The actual cost of the new cars to petitioner is the manufacturer's suggested list price less the full 25-percent dealer's discount. Both Dodge and petitioner know that; it is only for the

benefit of petitioner and petitioner's customers that the inflated invoice is sent to petitioner. The 2 to 2½ percent held back by Dodge is actually petitioner's money which is paid into a savings fund rather than as a part of the cost of the new car. It is doubtful that any such artificially created expenses would be deductible under any proper method of accounting, much less accounting for tax purposes. See *Schlude* v. *Commissioner*, 372 U.S. 128 (1963); *Simplified Tax Records, Inc.*, 41 T.C. 75 (1963). Nor can we give much weight to petitioner's argument that it should not be required to include the holdback in income until the new car is sold. It is not really an item of income produced by the sale; rather, the amount released to petitioner at the time of the sale is the release of an artificially inflated cost.

Upon these facts, then, we believe the respondent's determination that petitioner's method of accounting for the discount holdbacks does not clearly reflect income was fully warranted. Consequently, respondent was clearly within his authority in changing petitioner's tax-accounting treatment of this item to, in his opinion, more clearly reflect income.

Petitioner relies heavily on the fact that it has consistently treated the discount holdbacks in the same manner since its inception, and argues that its practice comports with sound accounting theory. However, we find little support for petitioner's position in either contention. Petitioner's consistency argument does not change the fact that its accounting procedure does not clearly reflect income, and the consistent use of an incorrect accounting practice does not cure its defects. *American Automobile Association* v. *United States*, 367 U.S. 687 (1961); *All-Steel Equipment, Inc.*, 54 T.C. 1749 (1970), affirmed on this point but reversed on other grounds 467 F. 2d 1184 (C.A. 7, 1972); *Dearborn Gage Co.*, 48 T.C. 190 (1967); *Photo-Sonics, Inc.*, 42 T.C. 926 (1964), affd. 357 F. 2d 656 (C.A. 9, 1966). Furthermore, though petitioner alleges the practice is sound accounting theory, the record contains no evidence in support of that conclusion, nor does it establish with any certainty that the accounting method is widely used by other automobile dealers.

A final argument asserted by petitioner as justification for its irregular treatment of the discount holdbacks is that the new car rebates were a fairly small part of its annual gross receipts, and thus, it is immaterial how they were treated. The respondent's adjustments with regard to the rebates were $26,524.96 and $43,922.02 in 1967 and 1968, respectively, while gross receipts from sales in those respective years were $5,154,996 and $6,409,794. We are not at all persuaded by petitioner's argument for we think that an accounting method which fails to accurately report approximately $70,000 of income over a 2-year period does not clearly reflect income, and omissions of those pro-

portions are certainly significant. *Wilkinson-Beane, Inc.* v. *Commissioner*, 420 F. 2d 352 (C.A. 1, 1970), affirming a Memorandum Opinion of this Court.

We hold for respondent on this issue, which makes it unnecessary for us to consider respondent's constructive receipt argument.

We turn next to the valuation of inventory issue. Here again, we are concerned with the problem of clearly reflecting income in an accounting practice.

Both parties agree that under the instant circumstances the proper valuation method for petitioner's used-car inventory is market value and not cost. The issue thus focuses on the accuracy of petitioner's computation of market value. Petitioner computes the market value of his used-car inventory by taking the NADA wholesale value of each model in its inventory [5] and discounting it by an arbitrary 20 percent. The values of all used vehicles in stock, thus computed, are then added together to produce an aggregate figure which is used as the closing inventory for the current year and the opening inventory for the following year in computing petitioner's annual profit or loss.

Petitioner defends its method of valuation on the grounds that it has consistently used the practice since its incorporation; that the practice best suits its needs, clearly reflects income, and is accepted and used in the automobile industry; that the practice was suggested to petitioner by a revenue agent in the 1940's; [6] and, that the provisions of section 446 were moderated with the enactment of the 1954 Code so as to allow more flexible hybrid methods of accounting to be used by all taxpayers. Based on these arguments, petitioner contends that respondent acted arbitrarily, erroneously, and in clear abuse of his discretion when he determined petitioner's valuation technique improper. Accordingly, petitioner argues that under the principles of equity and fair play, it should prevail on this issue.

Respondent, on the other hand, contends that petitioner's valuation technique is improper for it does not reflect the full market value of petitioner's used-car inventory, and consequently affects the yearend computation of petitioner's profits or losses, viz, petitioner's annual income is not clearly reflected. Respondent further argues that flat percentage-rate discounts used to determine the market value of inventory are not allowable; that NADA values, as computed, do accurately reflect true market value; and that petitioner's valuation technique has not been established as sanctioned or widely used by members of the automobile industry.

---

[5] The record indicates that petitioner's used-car inventory contained a few vehicles which were not automobiles, i.e., trucks and motorcycles.

[6] The suggestion was actually made to petitioner's parent corporation, Massey Motors, Inc.

As we pointed out heretofore, respondent has broad discretion in determining matters concerning accounting methods, and his discretion expressly extends to the proper use of inventories. *Photo-Sonics, Inc., supra; Dearborn Gage Co., supra.* Under the provisions of section 471 [7] respondent is delegated the authority to decide which inventory accounting method is most suited to petitioner's business. The section additionally provides that in making his determination, respondent must be guided by two considerations: (1) The best accounting practice in petitioner's trade or business, and (2) the most accurate method of reflecting income. Thus, we will not overturn respondent's decisions with respect to proper inventory methods unless it is established that he has forsaken the guidelines and abused his discretion by a clearly erroneous or arbitrary determination. The burden of proof rests with petitioner.

Having weighed the facts at hand in light of the applicable case law, we believe respondent's determination is sound. In the first place, petitioner has failed to prove that its inventory valuation technique is accepted or used by a wide segment of the automobile industry. The record does contain a "Dealers Operational Manual," distributed by Massey Motors, Inc., to all of its subsidiaries, which requires each dealership to value its yearend car inventory at 80 percent of NADA wholesale value. There is also H. E. Parks' testimony that he believes other dealerships use the valuation technique instituted by Massey Motors, Inc., among its dealers. These attempts at proof, however, fall considerably short of establishing that other members of the automobile industry widely use or even sanction the use of the 80 percent of NADA wholesale value technique for inventory valuation. Furthermore, even were we to find that many members of the business accept the accounting method, or have consistently used it, this would not bind the respondent to a determination that it clearly reflects income. *American Automobile Association* v. *United States*, 367 U.S. 687 (1961).

Secondly, we think there is ample evidence in the record to raise questions about the effect of petitioner's valuation technique on the clear and accurate disclosure of its annual income. The $33,708.01 increase in petitioner's taxable income attributable to respondent's change in the inventory valuation indicates that petitioner, an accrual basis taxpayer, was unduly deferring a sizable amount of income which should have been recognized in earlier years. Even stronger

---

[7] SEC. 471. GENERAL RULE FOR INVENTORIES.

Whenever in the opinion of the Secretary or his delegate the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary or his delegate may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

evidence of the imperfection inherent in petitioner's accounting method is the wide divergence between the value attributed by petitioner to its used-car inventory and the NADA wholesale value of the inventory or the actual cash receipts realized from the sale of the same inventory. Indeed, it was stipulated that petitioner's receipts from its sale of the used vehicles in inventory exceeded both the NADA wholesale values and the petitioner's values attributed to the inventory by an appreciable amount. Given the evidence herein, it would doubtless be difficult to find that petitioner's valuation technique more clearly reflects income than does respondent's method.

Furthermore, it has been held that a percentage reduction of the market value of inventory by an arbitrary percentage, purportedly to reflect defects, wear, and obsolescence, is not acceptable. *Joseph Elias & Co.*, 17 B.T.A. 628 (1929), affirmed per curiam 46 F. 2d 1015 (C.A. 2, 1931); *Otto A. Altschul*, 5 B.T.A. 53 (1926).[8] Moreover, respondent's choice of valuation in fact does more clearly reflect income. Our findings of fact disclose that the computation of NADA wholesale values takes into account the wear and obsolescence of an automobile of a particular make, model, and year in average condition. The record also indicates that, on the whole, petitioner's used-car inventory during the years in issue was in average condition, with the below-average-condition vehicles offset by above-average-condition vehicles. Finally, respondent's position with regard to the proper valuation of used-car inventory has been on record for a reasonable length of time (see Rev. Rul. 67–107, 1967–1 C.B. 115), and petitioner is deemed to have known his view.

We have previously responded to petitioner's consistency argument, and it would be pointless to repeat ourselves here other than to find that it is not decisive. Petitioner's contention that it instituted the 80-percent valuation method at the suggestion of one of the respondent's agents is equally unconvincing. There is no evidence in support of the allegation other than the vague recollection of one witness,[9] and even if the fact were established, the recommendations of respond-

---

[8] See also *Estate of Charles J. Ginsberg*, T.C. Memo. 1958–95, affd. 271 F. 2d 511 (C.A. 5, 1959).

[9] Mr. Parks testified that prior to World War II, when automobile dealers had relatively small inventories of used cars, they did not revalue them at all for yearend inventory purposes. After the war, as used-car inventories began to increase, a revenue agent suggested to Massey that the used-car inventory should be revalued at the end of the year to more clearly reflect income, and suggested using 80 percent of the NADA values. This, of course, resulted in increasing income because the used cars were usually undervalued due to the method used to cost a used car taken in trade. Perhaps to avoid a too precipitous increase in income at that time it was suggested that the 80 percent of NADA values be used. It is clear that as used-car inventories increased over the years, the use of less than market value in revaluing yearend inventories of used cars resulted in deferring larger amounts of taxable income, so if the respondent now determines that these inventories should be revalued at full market value, he is not necessarily being inconsistent or arbitrary because this treatment will more clearly reflect income on an annual accounting basis.

ent's agents are not binding on respondent and do not justify the continuance of an erroneous accounting practice, cf. *Swift Mfg. Co.* v. *United States*, 12 F. Supp. 453 (Ct. Cl. 1935), despite petitioner's continued use of the faulty practice for a number of years. *Niles Bemet Pond Co.* v. *United States*, 281 U.S. 357 (1930) ; *Caldwell* v. *Commissioner*, 202 F. 2d 112 (C.A. 2, 1953).

Petitioner's final argument is that under the 1954 Code, the bite of sections 446 and 471 was somewhat ameliorated by the increase in the number of allowable accounting methods, thus permitting all taxpayers to be more flexible in reporting their income. Petitioner argues that its method of accounting for inventory conforms with the requirements of both sections. We agree that under the language of sections 446 and 471 of the 1954 Code it is possible for a number of hybrid or derivative accounting practices to gain approval, if the practices (1) clearly reflect income and (2) are generally accepted by the particular trade or business of the concerned taxpayer. Nevertheless, there is still the requirement that the derivative practice meets the two preconditions, which have been in existence since long before enactment of the 1954 Code. The short answer to petitioner's argument is that petitioner has totally failed to establish that its valuation technique clearly reflects income or is accepted and used by its competitors. Therefore, petitioner is not entitled to continue its inventory valuation method in contravention of respondent's determination. We hold for respondent on this issue.

Pursuant to the changes made by respondent with respect to petitioner's accounting methods for reporting its dealer discount holdbacks and revaluing its yearend used-car inventory, respondent made adjustments under section 481 to prevent the omission of certain items of income from petitioner's 1967 and 1968 returns. The amount of discount holdbacks reported in 1967 but which should have been accrued in 1966 was also included in 1967, since 1966 is beyond the statute of limitations and not before the Court. Likewise, petitioner's used-car opening inventories for the year 1967 was increased by the amount respondent increased the closing used-car inventory for 1966. Again, however, because 1966 is beyond the statute of limitations and not before the Court, the amount eliminated from 1967, $13,192.69, by this adjustment was also included in petitioner's 1967 income to prevent it from altogether escaping taxation.

We have been unable to find any objection by petitioner to respondent's section 481 computations in the record or petitioner's briefs. We, therefore, sustain respondent's section 481 adjustments. All of the adjustments made by him are justified and clearly within his authority under section 481. *Graff Chevrolet Co.* v. *Campbell*, 343 F. 2d 568 (C.A. 5, 1965).

*Decision will be entered for the respondent.*