EPIC METALS CORPORATION AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Epic Metals v. Commissioner
Docket No. 2689-79.
United States Tax Court
T.C. Memo 1984-322; 1984 Tax Ct. Memo LEXIS 351; 48 T.C.M. (CCH) 357; T.C.M. (RIA) 84322; June 25, 1984. *351 S, a corporation, primarily sold products manufactured by M, a manufacturing corporation. S was the wholly owned subsidiary of M. S reported its income for Federal tax purposes on the cash method of accounting; M reported its income on the accrual method. The Commissioner determined that S was required by secs. 446 and 471, I.R.C. 1954, and the regulations promulgated thereunder to maintain inventories and to use the accrual method of accounting. Held, S is required to maintain inventories and to use the accrual method of accounting since its sales of the products were a material income-producing factor for S, and S has failed to prove that it did not have title to such products. Lester A. Katz,Herbert Alan Dubin, and Gerard J.Mene, for the petitioner. Kathleen E. Whatley, for the respondent. SIMPSON
MEMORANDUM OPINION SIMPSON, Judge: The Commissioner determined deficiencies in the petitioner's Federal income tax of $786,165 for the taxable year ended March 31, 1974, and $6,414 for the taxable year ended March 31, 1976. After concessions by the petitioner, the issues for decision are: Whether *353 Epic Sales Corporation is required by sections 446 and 471 of the Internal Revenue Code of 1954[1] and the regulations promulgated thereunder to maintain inventories and to use the accrual method of accounting for income tax purposes, and if not, whether by virtue of the fact that Epic Sales Corporation and Epic Metals Corporation are members of the same consolidated group, the transactions between them constitute nondeferred intercompany transactions which are subject to the income tax reporting provisions of section 1.502-13(b)(2), Income Tax Regs.
All of the facts have been stipulated, and those facts are so found. The petitioner, Epic Metals Corporation (EMC) and subsidiaries, had their principal places of business in Rankin, Pa., at the time they filed their petition. On November 29, 1973, EMC formed Epic Sales Corporation (ESC). ESC is a Pennsylvania corporation and a 100-percent subsidiary of EMC. For the years in issue, EMC filed consolidated returns for itself and its wholly owned subsidiaries, including ESC, with the Internal *354 Revenue Service, Philadelphia, Pa.EMC and ESC maintain separate accounting records. EMC uses the accrual method of accounting for both bookkeeping and income tax reporting purposes. ESC uses the accrual method of accounting for bookkeeping purposes but uses the cash method of accounting for income tax purposes. EMC is engaged in the manufacture and sale of metal products, primarily metal decking, modular buildings, and roofing systems, which are fabricated to custom specifications for each order from raw metal coils. EMC does not stock socalled standard or stock metal decking as finished goods, and it does not sell custom fabricated metal decking directly to the ultimate user unless it installs the metal decking at the jobsite. EMC employees, who are not part of the ESC sales department, solicit orders for EMC for custom fabricated metal decking that requires installation at the customer's jobsite. ESC derives its income from the sale of custom fabricated metal decking, which it sells without installation. It procures orders for metal decking through its own sales department, commission agents, dealers, and jobbers. It does not solicit orders which require jobsite installation; *355 when it encounters such an order, it refers the order to EMC. ESC places almost all of its orders for metal decking with EMC. However, ESC places orders for metal decking with fabricators other than EMC whenever EMC, for any reason, either chooses not to or is unable to fill an order. EMC fills approximately 95 percent of ESC's orders. ESC never has physical possession of the metal decking, whether the order is placed with EMC or another fabricator. Whether an ESC order is filled by EMC or by another fabricator, the order is always shipped F.O.B. fabricator's place of business. ESC's customer always has the right to select the mode of transportation and the specific carrier to transport the finished product to the jobsite. ESC's sales department consists of approximately 8 full-time sales persons located in Rankin and approximately 7 full-time sales persons located in Florida, Illinois, Michigan, Minnesota, North Carolina, and Ohio. ESC's vice president of sales is not an officer, director, shareholder, or employee of EMC. ESC pays rent at a fair price to EMC for the space it occupies in EMC's building. In addition, EMC charges ESC a yearly management service fee, and it *356 charges ESC for a percentage of certain expenses, including those for advertising, utilities, drafting, designing, and credit clearance. ESC and EMC have never had a master contract or any written contract describing the business transactions between them. During the years in issue, the typical transaction between ESC and EMC occurred as follows: ESC solicited an order from its customer or received an invitation to bid from a customer. ESC received and acknowledged the order from its customer. ESC received a sales tax exemption designating it as the vendor. ESC's sales department personnel sent a credit request from to the EMC credit department for approval. EMC charged ESC for the credit check. If the credit check disclosed that credit should not be extended, the order was rejected by ESC. If the order was accepted, ESC's sales department personnel completed an ESC order summary form. This form listed information concerning the order including quantity, pricing information, sales tax information, required shipping date, and sales terms. ESC's personnel forwarded a copy of the ESC order summary to EMC's production scheduling department. EMC's production scheduling department *357 used ESC's order summary to enter the order into EMC's computer. EMC then had its own personnel produce all the EMC documentation and paper work necessary to perform the custom fabrication of the metal decking. EMC contacted the ESC customer to confirm or adjust the time of shipment. Once EMC had completed the custom fabrication of the ESC order, EMC, as directed by ESC, loaded the metal decking onto the mode of transportation requested by the ESC customer (customer truck, contract truck, common carrier, or railroad car) for shipment to the ESC customer jobsite. The ESC-ordered custom fabricated metal decking was shipped directly to its customer's jobsite using ESC's shipping papers and bills of lading. EMC notified ESC when the metal decking had been shipped. After an order was custom fabricated but before it had been shipped from EMC's plant (while it was awaiting loading for shipment), the risk of loss or damage to the metal decking was with EMC. The risk of any loss or damage to the metal decking during transit was with the ESC customer under the shipping contract. ESC advanced freight charges for the shipment to its customer, and the freight charges were billed to the ESC *358 customer either as part of the purchase price or separately depending on the terms of the particular order. In either case, the ESC customer bore the freight charges and had the right to select the method of shipment and the specific carrier. EMC sent its invoice for the metal decking to ESC, and ESC paid the invoice by making payments to EMC. ESC then sent an invoice to its customer for the metal decking, and the customer paid the ESC invoice by making payment to ESC. ESC bore the credit risk should its customer default on the contract. In his notice of deficiency, the Commissioner determined that the accrual method of accounting used by ESC to keep its books and records should also be used in preparation of the consolidated return since such method clearly reflects income, and that the cash receipts and disbursements method used by ESC in the preparation of the consolidated return does not clearly reflect income. The Commissioner also determined that the use of the accrual method is necessary to clearly reflect the consolidated taxable income of EMC and its subsidiaries. Use of the accrual method of accounting, instead of the cash method, resulted in an increase in the petitioner's *359 taxable income for the taxable year ended March 31, 1974, of $1,386,605, and an increase in taxable income for the year ended March 31, 1976, of $238,737. The first issue for decision is whether ESC is required by sections 446 and 471 and the regulations promulgated thereunder to maintain inventories and to use the accrual method of accounting for income tax purposes. Section 446(a) provides the general rule that taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. Section 446(b) provides two exceptions to this general rule. Where no method of accounting has been regularly used by the taxpayer, or where the method used by the taxpayer does not clearly reflect income, the computation of taxable income shall be made under such method as in the opinion of the Commissioner does clearly reflect income. Sec. 446(b). The Commissioner's determination pursuant to his authority under section 446(b) is presumptively correct and must be upheld unless the taxpayer proves that it is clearly erroneous or arbitrary. Lucas v. Structural Steel Co.,281 U.S. 264, 271 (1930); Wilkinson-Beane, Inc. v. Commissioner,420 F.2d 352, 353 n.3 (1st Cir. 1970), *360 affg. a Memorandum Opinion of this Court; Brooks-Massey Dodge, Inc. v. Commissioner,60 T.C. 884, 891 (1973). Section 471 provides: Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income. The regulations promulgated under section 471 require that in every case in which the production, purchase, or sale of merchandise is an income-producing factor, in order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary. Sec. 1.471-1, Income Tax Regs. Such regulations further provide that merchandise should be included in the inventory only if title thereto is vested in the taxpayer. Sec. 1.471-1, Income Tax Regs. If inventories are required, the accrual method of accounting must be used with regard to purchases and sales, unless otherwise authorized. Sec. 1.446-1(c)(2)(i), Income Tax Regs. The Commissioner's discretion *361 in matters of accounting methods is very broad. Thor Power Tool Co. v. Commissioner,439 U.S. 522, 533 (1979); Commissioner v. Hansen,360 U.S. 446, 467 (1959). ESC argues that its cash method of accounting clearly reflects income pursuant to section 446. It contends that its accounting method reflects consistent application of generally accepted accounting principles and that its accounting method is one that is used by similarly situated taxpayers in its particular trade or business. It argues that industry practice and trade custom are the crucial elements in the determination of whether or not the cash method of accounting clearly reflects income, and that the Commissioner has unjustifiably ignored industry practice and trade custom in the present case. ESC maintains that if its accounting method satisfies section 446 and the regulations thereunder, we need not consider the applicability of section 471. However, if we should find that section 471 is applicable in the present case, ESC contends that it is not required by section 1.471-1 of the regulations to maintain inventories in order to reflect its income correctly since it is a jobber *362 or middleman for willing buyers and sellers of custom fabricated metal decking. It argues that it does not at any time have title to the metal decking which it jobs. Accordingly, ESC contends that if it is not required to maintain inventories, it is not required by section 1.446-1(c)(2)(i) of the regulations to use the accrual method of accounting for income tax purposes. The Commissioner, on the other hand, contends that ESC is a seller of custom fabricated metal decking, that ESC has title to the metal decking which it sells, and that the sales of such decking are an income-producing factor for ESC. Accordingly, the Commissioner argues that ESC is required by section 1.471-1 of the regulations to maintain inventories in order to reflect its income correctly, and that since it is required to maintain inventories, it is required pursuant to section 1.446-1(c)(2)(i) to use the accrual method of accounting for income tax purposes. Where inventories are required, the regulations mandate the use of the accrual method of accounting for purchases and sales. Sec. 1.446-1(c)(2)(i), Income Tax Regs. This principle has been consistently upheld by the courts. See, e.g., Niles Bement Pond Co. v. United States,281 U.S. 357, 360 (1930); *363 Wilkinson-Beane, Inc. v. Commissioner,420 F.2d at 354-355; Iverson's Estate v. Commissioner,255 F.2d 1, 2-5 (8th Cir. 1958), affg. 27 T.C. 786 (1957); Caldwell v. Commissioner,202 F.2d 112, 114 (2d Cir. 1953), affg. a Memorandum Opinion of this Court; Ezo Products Co. v. Commissioner,37 T.C. 385, 392 (1961). Thus, we must decide whether ESC must maintain inventories. The parties agree that the sales of custom fabricated metal decking were an income-producing factor for ESC; hence, resolution of the inventory question depends on whether ESC ever had title to the decking. The parties have stipulated, and we have found as a fact, that ESC never had physical possession of the metal decking. However, the regulations under section 471 are clear that title rather than physical possession determines whether merchandise should be included in inventory. Sec. 1.471-1, Income Tax Regs.
ESC argues strenuously that it is a jobber, and not a seller, of custom fabricated metal decking, and that, as such, it never acquires title to the metal decking. In support of such contention, ESC points out that it does not *364 manufacture goods; that it places orders for metal decking with manufacturers only after it has a firm order for the decking from its customer; that it never invests capital or labor in order to acquire or maintain an inventory of metal decking; that it never has control over or constructive possession of the custom fabricated metal decking; that after the metal decking is fabricated, it is shipped directly to ESC's customer from the manufacturer's plant, F.O.B. manufacturer's plant, and completely bypasses ESC in all respects; that ESC has no control over the manufacture or the method of transportation for the metal decking; that ESC does not bear the risk of loss during shipment, nor does it bear the risk of defects or errors during or arising out of the fabrication of the metal decking; and that the only risk ESC bears is the risk of nonpayment by its customer. ESC also argues that its practices are consistent with industry costom in that other jobbers or middlemen in the custom fabricated metal decking industry also never take title to the metal decking which they provide to their customers. The parties have stipulated that Pennsylvania adopted the Uniform Commercial Code (UCC), *365 effective July 1, 1954, and that Article 2 thereof is applicable to the transactions at issue. ESC, citing Pa. Stat. Ann. Tit. 12A, sec. 2-401(2) (Purdon 1970), argues that under the UCC, absent an explicit agreement to the contrary, title passes to the buyer when the seller completes his performance with respect to the physical delivery of the goods, that is when the seller places the goods with the carrier. ESC asserts that it had no contract or agreement with EMC or any other manufacturer with respect to the passing of title. ESC contends that title passed directly from the manufacturer to the customer at the point of shipment, here the manufacturer's plant. ESC concludes that title bypassed it. The Commissioner argues that ESC's arrangement whereby it never has physical possession of the metal decking is insufficient for it to avoid the requirement that it maintain inventories for tax purposes. He contends that even momentary title is sufficient to require the use of inventories. In support of his contention, the Commissioner cites Middlebrooks v. Commissioner,T.C. Memo. 1975-275, where we held, under the facts, that "While petitioner may have only possessed *366 title to the magazines for an 'instant' while the goods were carted through the carrier's front door, as respondent acknowledges, such possession of title was sufficient to require petitioner to inventory the product as his stock-in-trade under respondent's regulations." 34 T.C.M. at 1191, 44 P-H Memo. T.C. par. 75,275 at p. 1164-75. The Commissioner also contends that under applicable provisions of the UCC, title passes from EMC to ESC at the time and place of shipment, and that thereafter, title passes from ESC to its customer virtually immediately. He cites Pa. Stat. Ann. Tit. 12A, sec. 2-401(2)(a) (Purdon 1970), which provides that if the seller is authorized to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment. The Commissioner argues that ESC directs EMC to ship the metal decking directly to the customer using ESC's bill of lading and shipping papers, and EMC notifies ESC when the ordered metal decking has been shipped, thus fulfilling the requirements of Pa. Stat. Ann. Tit. 12A, sec. 2-504 (Purdon 1970), "Shipment by Seller." Accordingly, the Commissioner contends title *367 passes to ESC under section 2-401(2)(a), and the fact that the metal decking is delivered directly to the customer rather than to ESC does not prevent ESC from receiving title to the decking. Citing Los Angeles Paper Bag Co. v. James Talcott, Inc.,604 F.2d 38, 40 (9th Cir. 1979), he argues that delivery of goods to a third party pursuant to the buyer's instructions causes the buyer's title to pass to the third party. The Commissioner contends that ESC is not selling its services in arranging sales between the other two parties to the transaction, but instead has title to the metal decking and is engaged in selling the metal decking. Although ESC now claims that it never had title to the custom fabricated metal decking sold by it, the record before us does not disclose that such claim was ever made before this litigation, and such claim is wholly inconsistent with the treatment of the transactions by ESC and EMC and by ESC and its customers. ESC, EMC, and the ultimate purchasers of the custom fabricated metal decking all consistently treated the transactions as if title passed from EMC to ESC and then to the ultimate purchaser. ESC treated the transactions between *368 itself and EMC for Federal tax purposes as sales of the metal decking by EMC to ESC and the transaction between itself and the ultimate purchaser as a sale by ESC to such purchaser. On the consolidated returns, EMC treated the transaction as a sale and reported the income therefrom. On such returns, ESC treated itself as having purchased metal decking from EMC and claimed a deduction for cost of goods sold. Such treatment is wholly inconsistent with ESC's claim that it was merely a jobber. In addition, ESC was designated the vendor for State sales tax purposes, and in its contracts with its customers, ESC was designated as the seller. In another context, the previously stated: "When negotiating with customers over the terms of sales, petitioners could have insisted on a clear contractual statement of where title was to pass or could have arranged the terms to indicate clearly where the parties intended title to pass." Miami Purchasing Service Corp. v. Commissioner,76 T.C. 818, 830 (1981). What we said in Miami Purchasing Service Corp. is equally applicable in the present case. ESC could have set out in contracts between itself and EMC, and other fabricators, *369 exactly when, where, and to whom title to the custom fabricated metal decking was to pass. Had it done so, and had it otherwise acted consistently with such contracts, such provisions would have furnished clear evidence of the parties' intention and governed the passage of title under the UCC. Though ESC did not expressly set forth the terms for the passage of title, we believe that the practices of EMC, ESC, and the ultimate purchaser provide persuasive evidence of their intent to have title pass from EMC to ESC and then to the ultimate purchaser. ESC bears a heavy burden of proof in challenging the Commissioner's determination of the proper method of accounting. Thor Power Tool Co. v. Commissioner,439 U.S. at 533. [2] ESC has clearly failed to meet its heavy burden of proof in challenging the Commissioner's determination; it has failed to prove that it never had title to the metal decking. While ESC only had momentary title, title even for a moment is sufficient to require the use of inventories and the use of the accrual method of accounting. *370 Moreover, the facts of this case illustrate well the reason for requiring the use of inventories and the accrual method of accounting in such a situation. For its taxable year ending on March 31, 1974, EMC treated the costs of custom fabricated metal decking sold to ESC in such year as a cost of goods sold, and since it used the accrual method of accounting, it treated any such sale as an account receivable for such year. However, since ESC used the cash method for tax purposes, it treated all such purchases for which it made payments for such year as cost of goods sold and claimed a deduction for them, but if it did not actually receive payment for such sales until the succeeding year, such payments were not reported until the succeeding year. As a result, it deferred reporting over $1,386,605 of income. If those sales had been made directly by EMC to the ultimate purchaser, such income could not have been deferred, and if ESC is required to use the accrual method, it cannot be deferred. The creation of ESC to handle certain of the sales of the custom fabricated metal decking and its use of the cash method of accounting for tax purposes would result in the deferral of substantial *371 income, and such circumstances provide a sound basis for the Commissioner's position that the deferral of such income would be a failure to clearly reflect income within the meaning of section 446(b). ESC relies heavily on Simon v. Commissioner,176 F.2d 230 (2d Cir. 1949), affg. a Memorandum Opinion of this Court, as support for its contention that ESC, as a jobber, is not required to maintain inventories. Simon involved a taxpayer who attempted to change his accounting method from the cash to the accrual method without first obtaining the permission of the Commissioner. In Simon, the taxpayer did not keep on hand any stock of merchandise which could be called an inventory, did not make purchases until he had firm sales contracts, did not have goods delivered to him, but instead had such goods delivered directly to the purchaser from the manufacturer, did not invest any capital in a stock of goods on hand, and did not have any warehouse or storeroom for merchandise, and he argued that under the predecessor regulation to section 1.471-1, Income Tax Regs., the Commissioner's consent was not required to change from an improper to a proper method of accounting. *372 The Second Circuit explicitly held that it did not decide whether the Commissioner's consent was unnecessary to change from an illegal to a legal method of accounting. Rather, it held that given the circumstances of the taxpayer's business, there was no need for him to maintain an inventory and that, therefore, he could not rely on the necessity to use an inventory to justify his change of accounting method. ESC argues that Simon is binding precedent on taxpayers and the Commissioner alike and that under the rationale of Simon, the cash method of accounting is the only method permissible for it. In our view, the Second Circuit's opinion in Simon v. Commissioner,supra, is distinguishable. The Second Circuit decided the case on the ground that the taxpayer was properly characterized as a broker or commission merchant since his margin for profits and operating expenses was the 5 percent "commission" or "trade discount" allowed him by the manufacturers. Simon v. Commissioner,176 F.2d at 232. In the present case, ESC does not derive its profit from commissions or trade discounts. Rather, its profit is determined by the difference between *373 the price it pays EMC, or another fabricator, for the metal decking and the price at which it sells the metal decking to its customer. Thus, the facts of this case are fundamentally different from those of Simon.
Since we have concluded that ESC is required to maintain inventories, it follows that it is required to use the accrual method of accounting. Sec. 1.446-1(c)(2)(i), Income Tax Regs.; Record Wide Distributors, Inc. v. Commissioner,682 F.2d 204, 206 (8th Cir. 1982), affg. a Memorandum Opinion of this Court; Fred H. McGrath & Son, Inc. v. United States,549 F. Supp. 491, 493 (S.D. N.Y. 1982); Ezo Products Co. v. Commissioner,37 T.C. at 392. ESC disputes such conclusion and argues that "in numerous cases, the Tax Court has recognized that even the presence of inventory does not necessarily mean that the cash method of accounting does not clearly reflect income." In support of its contention, ESC cites Ezo Products Co. v. Commissioner,supra;Estate of Roe v. Commissioner,36 T.C. 939 (1961); Drazen v. Commissioner,34 T.C. 1070 (1960); Brookshire v. Commissioner,31 T.C. 1157 (1959), *374 affd. 273 F.2d 638 (4th Cir. 1960). Its reliance on such cases is misplaced. In Ezo Products Co. v. Commissioner,supra at 392, we stated: "In a number of cases we have recognized as petitioner argues that where inventories are so small as to be of no consequence or consist primarily of labor, the presence of inventories is not necessarily sufficient to require a change in petitioner's method of accounting." The present case is readily distinguishable in that the inventories involved are not inconsequential. In holding that ESC must maintain inventories and is required to use the accrual method of accounting, we have considered the petitioner's argument that its method of accounting had been consistently used and its argument that such method was used in its industry. However, such arguments are irrelevant. [3] In view of our holding, it is unnecessary to consider the Commissioner's alternative position concerning the applicability of the consolidated return regulations. *375 Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated.↩
2. ESC misapprehends its burden of proof when it states: Further, it is Respondent's burden to prove that ESC holds title to the custom fabricated metal decking. It is well-settled Pennsylvania law that proof of title is borne by the one who claims title, and in the case of personalty, the person in possession is presumed to be the owner. The burden is on the person out of possession to prove otherwise. Therefore, the burden is on Respondent to show that title is in the one who does not have possession of the custom fabricated metal decking, i.e., ESC. [Citations omitted.] In the present case, the Commissioner is not "the person out of possession." The burden of proof as to who has title in the present case is on the petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933); Duesenberg, Inc. of Delaware v. Commissioner,31 B.T.A. 922, 924 (1934), affd. 84 F.2d 921↩ (7th Cir. 1936).
3. The present case is clearly distinguishable from the case where a taxpayer has consistently used a particular method of accounting over a long period of time. Cf. Van Pickerill & Sons, Inc. v. United States,445 F.2d 918, 921 (7th Cir. 1971); Magnon v. Commissioner,73 T.C. 980, 1005-1006 (1980); Fort Howard Paper Co. v. Commissioner,49 T.C. 275, 284 (1967). ESC was formed on November 29, 1973, and thus, the Commissioner challenged its accounting method in its first year of operation. See Frank G. Wikstrom & Sons, Inc. v. Commissioner,20 T.C. 359, 362-363 (1953). Nor are we persuaded by the evidence introduced concerning industry practice and trade custom that ESC's cash method of accounting is the method of accounting utilized by similarly situated taxpayers in its trade or business, and that therefore, such method clearly reflects income. Industry practice and trade custom are factors to be considered in determining whether a method of accounting clearly reflects income. See Public Service Co. of N.H. v. Commissioner,78 T.C. 445, 456-457 (1982); Fox Chevrolet, Inc. v. Commissioner,76 T.C. 708, 728 (1981); Magnon v. Commissioner,supra at 1004-1006. However, industry practice is not determinative of whether an accounting method clearly reflects income. Public Service Co. of N.H. v. Commissioner,supra↩ at 455-456.